[Civ. Nos. 27339, 27496. Fourth Dist., Div. Two. Nov. 26, 1985.]

CALIFORNIA SHOPPERS, INC., Plaintiff and Appellant, v.
ROYAL GLOBE INSURANCE COMPANY, Defendant and Appellant.

4

8

■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**COUNSEL**

Herbert Hafif and Wayne J. Austero for Plaintiff and Appellant.

Grace, Neumeyer & Otto, Richard A. Neumeyer, Eric M. Taira, Mercer & Gallagher and Hugh J. Gallagher III for Defendant and Appellant.

**OPINION**

**McDANIEL, J.**—The appeal here is from a money judgment based upon six specific jury awards, including both contract damages for breach of an insurance contract and tort damages for breach of the implied covenant of good faith and fair dealing. The cross-appeal is from the trial court's post-judgment order striking the award of punitive (exemplary) damages.

The underlying action was brought by California Shoppers, Inc., (California Shoppers or the insured) and four of its shareholders against its insurance carrier, Royal Globe Insurance Company (Royal Globe or the insurer) to recover damages allegedly resulting from the breaches of two duties arising under the policy. One such breach was the refusal to indemnify the insured for a judgment awarded against it in a third-party action (the *Uneedus* action) brought by a competitor. The other was the failure to defend the *Uneedus* action. The main action also included a count for wilful breach of the implied covenant of good faith and fair dealing allegedly occurring in connection with the failure to defend, as well as a count for fraud allegedly occurring at the time the insurance was purchased.

In the course of the jury trial, the individual shareholder plaintiffs were nonsuited with reference to the counts noted as well as those for negligent and intentional infliction of emotional distress.[1]

The trial resulted in a verdict awarding itemized damages of: (1) expenses of $86,500 incurred by California Shoppers in satisfying the judgment awarded against it in the *Uneedus* action; (2) expenses of $39,000 incurred by California Shoppers in the defense of the *Uneedus* action; (3) so-called past inflation loss of $50,000; (4) attorney's fees of $59,493 necessarily expended (by California Shoppers in the litigation here) to procure benefits due under the policy; (5) damages for economic or business loss, $3 million; (6) punitive (exemplary) damages of $2 million; (7) prejudgment interest of $21,963.

Royal Globe moved: (1) for a new trial; and (2) for judgment notwithstanding the verdict. The first was denied, and the second was granted only as to the exemplary damages. In ruling on the latter motion, the court recited that "the evidence considered in its entirety is legally insufficient to justify or support an award of punitive damages against the defendant Royal Globe. There is no showing that the defendant was guilty of oppression, *fraud* or malice, or that the defendant acted with intent to vex, injure or annoy, or that it acted with a conscious disregard of plaintiff's rights." The court ordered that the award of exemplary damages be stricken, and, "as to the claim and cause of action of plaintiff for punitive damages, that judgment be entered in favor of defendant . . . and against the plaintiff." (Italics added.)

Royal Globe appealed from the judgment, from the order denying its motion for judgment notwithstanding the verdict as to the issues other than exemplary damages (a nonappealable order), and from the order denying its motion to tax costs.[2] California Shoppers, for its part, cross-appealed from the postjudgment order which struck the exemplary damage award, and from "all other appellable [*sic*] adverse rulings, orders and judgments including but not limited to evidentiary rulings," and two specific orders.[3]

Based on interpretation of the policy, particularly the so-called shield clause, we shall affirm the award of contract damages for the refusal to

---

[1] The first amended complaint did not include counts by California Shoppers for intentional and negligent infliction of emotional distress. The torts alleged by California Shoppers against Royal Globe were an intentional breach of the implied covenant of good faith and fair dealing and fraud.

[2] Because Royal Globe has not briefed the costs issue, we deem it to have been abandoned.

[3] Because California Shoppers has briefed only the exemplary damages issue, we will not consider the remainder of its cross-appeal.

indemnify. For reasons recited *infra,* we shall also affirm the contract damages for failure to defend.

Otherwise, the undisputed evidence does not support any permissible inferences of tortious behavior necessary to uphold the award of compensatory damages for so-called bad faith. Additionally, because of its speculative nature, the evidence offered to prove tort damages was insufficient, and certain of the instructions given on bad faith were erroneous. On these three grounds, alternatively, the award of tort damages for the alleged economic loss will be stricken. The absence of evidence establishing tort liability also eliminates the basis for awarding attorney's fees. Finally, with no evidence to support the compensatory damages in tort, a fortiori the exemplary damages were properly stricken by the trial court.

The triggering event leading to the litigation here was Royal Globe's failure to provide a defense for the *Uneedus* action brought against California Shoppers. Such failure was solely the consequence of Royal Globe's mistaken belief, contributed to by California Shoppers, according to uncontradicted testimony, that defense of the *Uneedus* action had been tendered not by California Shoppers but by another corporate entity (Adco), one actually not even named as a defendant in the *Uneedus* action.

In attempting to uphold on appeal that portion of the judgment awarding compensatory tort damages, California Shoppers continues in this court an effort it successfully pursued in the trial court, where it characterized Royal Globe as having grossly violated some vaguely defined duty of good faith and fair dealing, and where it urged the jury in polemic if not inflammatory terms that Royal Globe should be punished for that behavior in the form of a sufficiently large compensatory award to justify a commensurately large award of exemplary damages. That vagueness fails in this court to obscure the manifold prejudicial errors which abound in this record.

■ As observed in this vein by Justice Kaufman in *Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5 [130 Cal.Rptr. 416], "Nevertheless, ' "[w]hen the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice, *the duty is then imposed upon the reviewing court to act." '* (*Cunningham* v. *Simpson,* 1 Cal.3d 301, 308-309 [81 Cal.Rptr. 855, 461 P.2d 39]; accord: *Bertero* v. *National General Corp., supra,* 13 Cal.3d [43] at p. 64 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; *Forte* v. *Nolfi, supra,* 25 Cal.App.3d [656] at p. 688 [102 Cal.Rptr. 455].)" (*Id.,* at p. 17, italics added.)

■ On the tort liability issue, even accepting the failure to defend as having been a breach of contract, an insurer's responsibility to act fairly and in good faith in handling an insured's claim "is *not* the requirement mandated by the terms of the policy itself—to defend, settle, or pay. It is the obligation . . . under which the insurer must act fairly and in good faith in discharging its contractual responsibilities." (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573 [108 Cal.Rptr. 480, 510 P.2d 1032], italics added.) In other words, per *Gruenberg,* the elements of the tort cannot be defined by the terms of the policy; for there to be a breach of the implied covenant, the failure to bestow benefits must have been under circumstances or for reasons which the law defines as tortious. As confirmed in *Hanson* v. *The Prudential Ins. Co. of America* (9th Cir. 1985) 772 F.2d 580, "[t]he mere denial of benefits, however, does not demonstrate bad faith." (*Id.,* at p. 584.) On this record, with reference to alleged bad faith, all that is shown is a denial of benefits in the form of a failure to defend because of a mistake induced by the insured.

Finally, there was no showing whatsoever of any entitlement to what California Shoppers characterized as damages for "past inflation loss," and so they too will be stricken.

### SYNOPSIS OF THE FACTS

As noted, there was no dispute in the direct (Evid. Code, § 410) evidence presented at the trial; here is what it shows. Adco Advertising, Inc. (Adco), not a party to these proceedings, was the publisher of the "Pennysaver," a very successful "give-away" type, advertising newspaper published and distributed in Orange County. Some of the principals of Adco decided to launch a similar venture in Riverside County, and, with that objective, they invested $35,000 in the venture and caused California Shoppers to be organized as a corporation, with the result that certain of these Adco principals were also principals of California Shoppers. In any event, in this mode, California Shoppers commenced publication and distribution of the "California Shopper" in Riverside County.

Royal Globe, which, through the Jay and Renfro agency in Newport Beach, had written Adco's business liability insurance coverage otherwise for several years, upon overtures from California Shoppers, issued a similar insurance policy (the policy) to California Shoppers, also through that same agency, with an effective date of March 1, 1975. That policy, the one here sued upon, recited in pertinent part:

"1. PERSONAL INJURY AND ADVERTISING OFFENSE LIABILITY COVERAGE

"(A) The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury or advertising offense sustained by any person or organization and arising out of the conduct of the named insured's business . . . and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury or even if any of the allegations of the suit are groundless, false or fraudulent . . .

"(B) This insurance does not apply: . . .

"(2) to personal injury or advertising offense arising out of the wilful violation of a penal statute or ordinance committed by or with the knowledge or consent of any insured. . . .

"'advertising offense' means injury occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright, title or slogan."

On March 5, 1975, California Shoppers distributed the first edition of "California Shopper" in five communities in Riverside County. The following week, "California Shopper" offered free "reader ads," "for a limited time only" (the ad), which, as explained below, became the basis for the third-party litigation, alleged by California Shoppers to have been within the risk of its policy coverage by Royal Globe.

At this same time, another such give-away type newspaper called the "Hi-Liter" was being published by Uneedus Corporation (Uneedus) and distributed in the same five Riverside County communities as was "California Shopper." On May 14, 1975, because of *the ad*, Uneedus filed against California Shoppers the third-party action above noted, alleging that California Shoppers had violated the Unfair Practices Act, particularly as contained in Business and Professions Code section 17043,[4] in that it was selling below-cost advertising *"with the intent to injure [Uneedus]."*[5] (Italics added.)

---

[4]Section 17043 reads as follows: "It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition."

[5]Business and Professions Code section 17071 reads as follows: "In all actions brought under this chapter proof of one or more acts of selling or giving away any article or product below cost or at discriminatory prices, together with proof of the injurious effect of such acts, *is presumptive evidence of the purpose or intent to injure competitors or destroy competition."* (Italics added.)

The named defendants in the *Uneedus* complaint were California Shoppers and five individuals, including Herb Sutton, who was the 100 percent stockholder of Adco, and also was a 21 percent stockholder in California Shoppers.

After California Shoppers was served, Sutton sent the summons and complaint to Jay and Renfro, the agency which had sold to California Shoppers the policy noted. Inexplicably, however, *the summons and complaint were sent by Sutton to Jay and Renfro without a cover letter of explanation, and in an Adco envelope bearing Adco's imprinted return address.* Roy Gibson, the office manager at Jay and Renfro, then sent the summons and complaint on to a Royal Globe claims office and, because he assumed that this service of process had been upon Adco (Gibson testified: "When I received [the *Uneedus*] summons all I saw was Herb Sutton. Herb Sutton, Adco, and the 'Pennysaver' were all synonymous as far as I was concerned because we had quite a few claims with them"), Gibson referred to *Adco's* policy number in his covering correspondence to Royal Globe's claims manager in Tustin. That claims manager sent the correspondence and litigation papers on to Royal Globe's Riverside claims office.

On June 6, 1975, R. S. Scott, Royal Globe's claims manager in Riverside, wrote the following letter, addressed to *"Adco Advertising Inc.[,] dba Pennysaver[,]* 27742 Forbes Road[,] Laguna Niguel, Ca. 92677[.] RE: Summons and Complaint #112236 [the *Uneedus* action]. Gentlemen: [¶] Attached find Summons and Complaint Case number 112236. We have reviewed the allegations and contentions of the plaintiff and we have also reviewed your policy. It is our opinion that there would be no coverage for this suit and we, therefore, return it to you so that you may obtain counsel and handle as you see fit. [¶] Should you have any further questions, please do not hesitate to call. Very truly, ROYAL GLOBE INSURANCE[,] R.S. Scott[,] Claims Manager[,] Claims Dept.[,] RSS/pw, cc/Jay and Renfro[.]"* (Italics added.) The record is not clear just how the contents of this letter were actually transmitted by Adco to California Shoppers, if at all.

Necessarily anticipating the disagreement among the panel concerning the significance of what Scott did or did not do before writing the letter of June 6, 1975, we deem it imperative to set forth pertinent excerpts of the record, first, testimony from Gibson, the person at Jay and Renfro who received from California Shoppers the summons and complaint, without covering letter, in an Adco envelope, and who later sent it on to Royal Globe's claims manager Fred Pelosi in Tustin, and then testimony from Scott.

By Mr. Austero, to Mr. Gibson:

"Q. Did you read the names of the persons that were being sued on the complaint?

"A. Yes, I did.

"Q. Did you see that California Shoppers was being sued?

"A. They—the name I saw was Herb Sutton.

"Q. So I take it you didn't recognize that California Shoppers was being sued?

"A. Well, their name, but I never heard of them.

"Q. Did you make an investigation in your office to determine if Jay and Renfro had ever sold insurance to California Shoppers?

"A. I didn't.

". . . . . . . . . . . . . . . . . . . . .

"Q. And did you at any time after sending this letter to Royal Globe have a conversation with Dick Scott [defendant's claims manager in Riverside, *supra*]?

"A. Several.

". . . . . . . . . . . . . . . . . . . . .

"Q. And did you send the summons and complaint directly to Dick Scott?

"A. I did not.

"Q. Who did you send it to?

"A. I sent it to Fred Pelosi in Tustin. We have instructions to send all of our claims to the Tustin office since they moved down here from Los Angeles.

"Q. And then did Fred Pelosi ever contact you about the summons and complaint you had sent to them?

"A. He did. He said he was sending it to Dick Scott in Riverside.

"`. . . . . . . . . . . . . . . . . . . . . . . .`

"Q. Did you have a conversation with Dick Scott as to whether Royal Globe was going to accept or reject coverage under the—with respect to the complaint you sent them?

"A. I don't remember.

"`. . . . . . . . . . . . . . . . . . . . . . . .`

"Q. At the time your deposition was taken, do you recall having a conversation with Mr. Scott as to whether there was coverage or not?

"A. Well, I probably did, yes, 'cause he wasn't sure, if I recall, he wasn't sure there was coverage.

"Q. And did—didn't he tell you that he was going to have to review it to determine if there was coverage?

"A. Yes.

"`. . . . . . . . . . . . . . . . . . . . . . . .`

"Q. And isn't it a fact, sir, that he in fact told you that there was no coverage under—

"A. Later you mean?

"Q. Well, on the telephone prior to June 3rd '75?

"A. That there was no coverage?

"Q. Yes.

"A. I've got to say I can't remember.

"Q. Some time after?

"A. Because I really don't.

"Q. Sometime after June 3rd '75 did he tell you on the telephone or any personal conversation with him that there was no coverage?

"A. I'm sure he did because he was going to contact Adco's attorneys.

"Q. And your impression at that time, sir, that the reason Royal Globe was denying coverage was because the claim wasn't encompassed within the policy provisions; isn't that true?

"A. Yes.

"Q. And it was your impression, isn't it true, sir, that you in no way at that time understood Royal Globe's position to be that California Shoppers was not an insured under a Royal Globe policy; isn't that true?

"A. It was never brought up.

". . . . . . . . . . . . . . . . . . . . . . .

"Q. Did you ever have conversation with anybody from California Shoppers at all?

"A. Yes.

"Q. Who was that with?

"A. Not California Shoppers, no. Adco.

". . . . . . . . . . . . . . . . . . . . . . .

"Q. (By Mr. Austero) Sir, you understood that Royal Globe was denying coverage to Adco Advertising, right?

"A. Right.

". . . . . . . . . . . . . . . . . . . . . . .

"Q. You have no recollection as to whether Royal Globe ever told you what the reasons for denying coverage were?

"A. No.

"Q. Do I understand you to say you have no recollection if they ever told you what the reasons for denial of coverage were?

"A. All I know is they said there was no coverage under the policy.

"Q. Sir, was, to your knowledge, California Shoppers in fact an insured with Royal Globe on May of—in May of '75?

"A. With us, no. I had never heard of California Shoppers.

". . . . . . . . . . . . . . . . . . . .

"Q. Prior to [the time you received the summons in the present case] you had no knowledge that California Shoppers was insured by Royal Globe?

"A. I really don't think I did.

". . . . . . . . . . . . . . . . . . .

"Q. When Royal Globe advised you that there was no coverage, did you call anybody on behalf of Adco or Herb Sutton for the purpose of investigating or determining who California Shoppers was?

"A. California Shoppers had never even been mentioned.

"Q. Their name was on the cover of the complaint.

"A. It was on the cover. When I received that summons all I saw was Herb Sutton. Herb Sutton, Adco and the 'Pennysaver' were all synonymous as far as I was concerned because we had quite a few claims with them.

". . . . . . . . . . . . . . . . . . . .

"Q. Now Mr. Gibson, when you were advised by Royal Globe that they were denying coverage, did you question in your own mind why coverage was being denied?

"A. I turned it over to Mac Renfro. And that's when he told me to send it to Fireman's Fund which had their umbrella policy.

". . . . . . . . . . . . . . . . . . ."

After the Scott letter of June 6, 1975 (*supra*), was read into evidence, the questioning proceeded:

"Q. . . . first time you were aware of the complaint against Herb Sutton was when you actually received it in your office about May of '75?

"[A.] Yeah. We received it from Adco.

". . . . . . . . . . . . . . . . . . . . . . . .

"Q. Adco was not named on a complaint, were they?

"A. The one we looked at the other day?

"Q. The complaint that you forwarded to the company, yes.

"A. I don't believe so."

Later in the trial, Scott testified extensively, including answers to the following questions by Mr. Hafif.

"Did you make any investigation as to whether any of the named defendants in [the *Uneedus*] complaint were listed as insureds under [Adco's] policy?

"A. . . . I cannot tell you specifically on that specific case. It has been too many years, but I can again tell you what my routine was: That it probably would have struck me as very strange that the policy was sent to me as Adco Advertising and yet they were not a named defendant. My routine would have been to check and see if any of the individuals under the Adco policy were an additional named insured, assuming that was the reason it was sent to me.

". . . . . . . . . . . . . . . . . . . . . . . .

"Q. But you denied coverage to everybody?

"A. I denied it to Adco.

"Q. . . . without checking as to whether any of these individuals had coverage under the Adco policy, you denied coverage as to whoever, didn't you?

"A. They never made a demand on me, counselor. I never got a suit from an individual. I got a suit from a corporation called Adco. No individual has ever said they had been served for demand upon me to cover them or provide them with a defense.

"Q. Well, you got a copy of the complaint and you were asked to handle the claim?

"A. That's correct.

"Q. From that you couldn't tell whether the individual had been served or not served, could you?

"A. That's correct.

"Q. But you didn't make any inquiry to find out, did you?

"A. That's correct.

"Q. You didn't make any inquiry to find out whether some of those individuals might be covered under an Adco policy, did you?

"A. Say again?

"Q. You didn't make any inquiry to determine whether those individuals named in there might also be covered under the Adco policy, assuming you were misunderstanding which policy was being claimed?

"A. I don't believe I made that statement. In fact, I think I said just the contrary.

" . . . . . . . . . . . . . . . . . . . . . . .

" '[From Scott's deposition, read by Mr. Hafif] Q. Did you specifically to the best of your recollection tell Mr. Gibson that the reason you were not going to be able to handle the matter is that Adco was not a named defendant?

" 'A. Well, if you realize the specifics of it, the policy that was sent to me was under Adco. And obviously I could not set up a claim under Adco's policy since they were not a party to the action. So therefore, all I can say is that I probably and in most likelihood said to Mr. Gibson "Since Adco isn't a named party, I can't set it up under California Shoppers." ' "[6]

Otherwise, Scott testified that he had "no knowledge that Royal [Globe] insured anybody named California Shoppers"; also, that he "had to have a

---

[6]Portions of Scott's testimony, by his own qualification of his answers, were suppositions as to what he "probably" did in terms of his customary procedures. In other words, Scott had no actual recollection of certain of the things he testified to. The events occurred in 1975; the trial was in 1981.

policy number in order to obtain specific information regarding an insured, because there was no alphabetical listing at that time."

Affording an insight into certain background aspects of this litigation, Michael Harding, California Shopper's house counsel, testified that on February 2 or 4, 1976, he was told about Royal Globe's denial of coverage, and that he proceeded to undertake a "fact finding" mission for California Shoppers by: (1) showing a copy of its policy without any names on it to a friend in the insurance business and asking for the friend's opinion as to whether Royal Globe should defend the suit; (2) having people in his, Harding's, office research the Insurance Code; (3) reading the policy himself; and (4) sending the policy to Odgers (one of California Shopper's attorneys in this suit) for an opinion. Harding testified that he contacted Odgers because "I knew he did a lot of appellate work and . . . did a lot of research in the area of bad faith."

Harding also testified that he had a financial interest in the outcome of the present suit, and that he had an agreement with California Shoppers whereby he, Harding, was to get "25 percent of whatever is recovered as attorney fees . . . ."

In any event, California Shoppers handed over the defense of the *Uneedus* action to Adco's attorneys, Kindel and Anderson, and retained Odger's firm to file the present suit against Royal Globe on June 7, 1976.[7] On June 8, the day *after* the suit here was filed, Harding made his first attempt to contact Royal Globe by calling Gibson. Harding testified: "I asked [Gibson] what did Royal Globe tell him they were relying on in the policy so I could show it to my client . . . and he said, well, you got the letter and they just said there's no coverage. And he said the guy to get ahold of is a guy named Scott. And I could never find Mr. Scott. And until I heard from Mr. Ibold [defendant's attorney, in August, 1976, *infra*], that was the only contact I'd had with Royal Globe."

On July 7, 1976, a month after the complaint here was filed and about two months before the *Uneedus* trial was scheduled to begin, California Shoppers for the first time served upon Royal Globe a copy of the original summons and complaint in this action.

Quite apart from any litigation thus far noted, on July 28, 1976, California Shoppers was otherwise sued by *Adco* no less on several theories, in-

---

[7]The original version of California Shopper's complaint is not a part of the record on appeal. We shall refer below to California Shopper's first amended complaint, which was the complaint at issue on which the case went to trial.

cluding defamation and unfair competition, this notwithstanding that California Shoppers and Adco had several common principals. Despite the fact that California Shopper's house counsel Harding "could never find Mr. Scott" in processing the *Uneedus* action against California Shoppers, this same attorney did not report any difficulties in transmitting to defendant the summons and complaint filed in the *Adco* action against California Shoppers, along with a cover letter referring to California Shoppers' *policy number* and to California Shoppers as "your insured," and requesting that Royal Globe provide a defense to the *Adco* action, all in marked contrast to how the *Uneedus* summons and complaint served on California Shoppers had been earlier handled. Moreover, Royal Globe *did undertake* defense of the *Adco* action against California Shoppers.

Harding, California Shoppers' house counsel, as noted, at the request of Charles Ibold, Royal Globe's attorney, arranged a meeting on August 30, 1976, with Stephen Odgers, the attorney who was handling California Shoppers' suit against Royal Globe. It was held in Harding's office, and the purpose of the meeting was to discuss settlement of this litigation here as well as California Shoppers' tender of the *Adco* action for defense. Ibold testified, without contradiction, that at that meeting he actually offered, on Royal Globe's behalf, to assume California Shoppers' defense of the *Uneedus* action, the trial of which was then set to begin in about a week. Ibold also testified that Odgers' response to this offer was that Royal Globe could "defend and control the suit" on condition that California Shoppers' then attorneys in that case would be retained by Royal Globe and would continue to handle the defense, that Royal Globe agree to indemnify California Shoppers for any judgment, and that *Royal Globe forthwith pay California Shoppers $100,000,* in addition to the attorney's fees incurred up to then in the *Uneedus* action.

With reference to the August 30, 1976, meeting, Harding testified that "[w]e were very firm that anything that got resolved [in this litigation] would be with attorney fees." Then the following exchange took place between Harding and Mr. Hafif:

"Q. Now following that meeting did you receive a copy of a letter from Mr. Odgers to Mr. Ibold outlining the meeting itself? Why don't you take time to read that?

"A. Yes, I received this letter.

"Q. Okay. And did it outline—the circumstances of the discussions that you recall conform to that letter?

"A. Yes."

James Coffran, one of the principals of California Shoppers, was present during a part of the meeting, and he testified on direct examination that Ibold had offered to handle the defense of the *Uneedus* action. More exactly, he testified, "[a]nd I think the way it came out that they would, you know, that they would take over the case, but they wouldn't cover us if a judgment came down, you know, because of, you know, their defense work. And obviously I wouldn't be comfortable with that."

In sum, responding to Royal Globe's offer to defend the *Uneedus* action, California Shoppers then demanded, not only that the defense be continued with counsel of California Shoppers' choice and that *coverage* of the *Uneedus* risk be accepted, but also that Royal Globe pay California Shoppers its legal expenses actually incurred in defense of the *Uneedus* action *plus $100,000 in settlement of the action California Shoppers had filed against Royal Globe here.*

Four days later, Odgers sent a letter to Ibold primarily with reference to settlement of this litigation here as follows:

"September 3, 1976

"Mr. Charles R. Ibold, Jr.
Ibold, Anderson, Mercer & Gallagher
Attorneys at Law
2600 Wilshire Blvd., Suite 222
Los Angeles, California 90057

"RE: *California Shoppers, et al, vs. Royal Globe Ins., et al*
*Uneedus vs. California Shoppers, et al*
*ADCO vs. California Shoppers*

"Dear Mr. Ibold:

"After our meeting on Monday, August 30, I thought I would follow it up with this letter. I enclose an extra copy so that you might send it to the appropriate officials of Royal Globe at the headquarters.

"The potentiality of this lawsuit [the one here under litigation] is such that I'm sure you wish to bring the factual situation to the top management of Royal Globe.

"As I indicated to you at our meeting, I think that Royal Globe, in order to avoid making a bad situation worse, should definitely immediately *assume*

*the defense of California Shoppers on the lawsuit recently brought by ADCO, and also coverage.* My understanding of this lawsuit is that it falls squarely within the coverages of the policy bought by California Shoppers.

"I reiterate that our *demand for settlement* at this time *on the lawsuit brought by California Shoppers against Royal Globe* Insurance Company is as follows:

"1. Pay attorneys' fees thus far expended by California Shoppers in the full amount;

"2. Pay attorneys' fees for the remainder of the defense of the lawsuit;

"3. Pay for any judgment returned against California Shoppers; and

"4. Offer $100,000 for settlement of the claims for emotional distress and general damages alleged in the complaint on behalf of the four or five plaintiffs against Royal Globe.

"I'm sure you realize that *the above things* are separable and that failure to remedy the situation is going to put Royal Globe in a situation from which it will be even more difficult to extricate itself than the one it is now in.

"I'm sure you appreciate the fact that California Shoppers does not desire to have any other counsel substituted in place of Kindel & Anderson, as Royal Globe told California Shoppers to hire its own attorneys, which it did. At this late stage, it would be most difficult for other attorneys to acquire the thorough knowledge of the case that Kindel & Anderson have, and it would be equally difficult to ask the judge for a continuance on the day set for trial, since the judge would undoubtedly become most upset.

"Again, I would like to take this opportunity to reiterate my understanding of Royal Globe's position is that it did not know California Shoppers was involved in a lawsuit and that you are going to be treating the first notice as of about the date of our meeting as being completely untenable.

Yours truly,
LAW OFFICES OF HERBERT HAFIF
By
Stephen L. Odgers

SLO:dl
Enc.
P.S. This offer will expire on September 18, 1976." (Italics added.)

Odgers did not testify at the trial about either the meeting or the intendments of the letter. In any event, as a result of the meeting between Ibold, Odgers and Harding and the quoted letter from Odgers, Royal Globe, as noted earlier, actually *did* undertake defense of the *Adco* action against California Shoppers. Otherwise, Royal Globe did not respond to Odgers' solicitation of an offer to settle the action here under litigation. As to the third feature of the letter, only *implied* by the next to last paragraph, i.e., Royal Globe's possible handling of the defense of the *Uneedus* action, nothing ever developed in this regard, for California Shoppers, by means of this letter, never really made a demand that Royal Globe take over defense of the *Uneedus* action. Obviously, Royal Globe did not accept coverage.[8] As a consequence, the *Uneedus* action went forward with California Shoppers' defense in the hands of counsel it had retained soon after the letter of June 6, 1975.

On June 6, 1977, and after the intended decision in the *Uneedus* action was announced, California Shoppers sold its assets for $1.5 million.

Otherwise, with reference to California Shoppers' alleged theory of economic loss arising because "defendant consciously and knowingly" (from California Shoppers' complaint, *infra*) refused to defend the *Uneedus* action, California Shoppers contends that it was "immediately" and proximately injured by such refusal to defend. The facts just related show that the sale of California Shoppers' assets did not take place until *two years* after Scott's letter of June 6, 1975, and nine months after the Odgers letter.

In any event, two months after the sale noted, judgment was entered in the *Uneedus* action in favor of Uneedus for $25,000 in general damages and $10,000 in attorney's fees. Uneedus' request for treble damages was denied by the trial court, on the ground that California Shoppers' acts "were not done with malice or oppression towards [Uneedus] nor were they of such magnitude to warrant the imposition of treble damages." Uneedus appealed, claiming that the failure to award treble damages was error. Royal Globe *did* provide counsel to represent California Shoppers as the judgment debtor in its response to the appeal of the *Uneedus* judgment.

In *Uneedus* v. *California Shoppers, Inc.* (1978) 86 Cal.App.3d 932 [150 Cal.Rptr. 956] (*Uneedus*), this court held that "a private plaintiff who has proved actual damages under the California Unfair Practices Act is entitled to mandatory treble damages," and that "the issue of whether [California Shoppers] acted maliciously or whether its acts 'were . . . of such magni-

---

[8]Royal Globe is still contesting the issue of coverage.

tude to warrant the imposition of treble damages' is not present in the case." (*Id.*, at p. 936.) We ordered the judgment modified to treble the damages accordingly.

On April 2, 1979, about a month after the California Supreme Court denied a hearing in *Uneedus,* Royal Globe wrote a letter to California Shoppers which recited in part: "We have now been instructed by our client to inform your office that they are formally refusing to indemnify your client for settlement monies expended. It's clear from a reading of Business and Professions Code Section 17043 that the law which your clients were accused of willfully violating constitutes a penal statute. The decision of the Appellate Court in determining the treble penalty provision of the law is mandatory in application, confirms the penal nature of the law. And as you're aware, the special shield endorsement for the policy specifically excludes willful violations of a penal statute involving an advertising offense. And this is exactly what your clients have been found liable for.

"Notwithstanding the above, we recognize that a faint possibility exists that Royal may have owed your client a defense, although not indemnification."

About two years later, the case here under review proceeded to a jury trial with the results earlier noted.

## ISSUES, CONTENTIONS AND DISCUSSION

In pursuing its appeal, Royal Globe has made numerous assignments of error. Moreover, besides appealing from the judgment, Royal Globe has asked that we review the trial court's order after judgment to the extent that it did not grant Royal Globe's motion for judgment notwithstanding the verdict.

This procedural posture of the case provides a convenient way to deal with certain of the assignments of error as to the tort damages, including the attorney's fees. In other words, we shall address these items of the verdict in terms of the propriety of the trial court's ruling on the motion for judgment notwithstanding the verdict, doing so, of course, in conformity with the standard of review thereto applicable. Treatment of the cross-appeal will also proceed similarly, for the motion was granted as to the exemplary damages.

The standard of review noted is the subject of frequent recitation. ■ In *Hauter* v. *Zogarts* (1975) 14 Cal.3d 104 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282], the Supreme Court quotes from *Brandenburg* v. *Pac. Gas & Elec. Co.* (1946) 28 Cal.2d 282, 284 [169 P.2d 909], that, " '[a] motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' " (*Id.*, at p. 110.)

Broadly at issue are three areas of asserted liability. The first is whether there was a breach of the contractual duty to indemnify California Shoppers for the judgment awarded against it in an earlier action (the *Uneedus* or third-party action), such duty allegedly arising from the insurance policy written by Royal Globe. The second is whether there was a breach of the contractual duty to defend California Shoppers in the *Uneedus* action, also arising from the policy. The third is the propriety of the tort damages awarded. Its resolution depends in turn on several subsidiary issues, namely: (1) whether the breach of the contractual duty to defend, if it occurred, was for reasons which could characterize such breach as also being the tort of bad faith; (2) whether the misleading nature of the jury instructions on bad faith and on the measure of damages amounted to prejudicial error; and (3) whether the evidence of such damages was speculative. In addition, with reference to the cross-appeal, there is the issue of whether there is any evidence in the record of additional circumstances present in connection with breach of the duty to defend, to show oppression, fraud or malice, so as to expose Royal Globe to liability for exemplary damages.

In our view, as earlier noted, the record supports the jury's findings that there were breaches of both contractual duties, and that there were damages suffered attributable thereto, i.e., the amount of the final judgment awarded against California Shoppers in the *Uneedus* action in which it was defendant, together with prejudgment interest here, plus the cost of retaining other counsel to defend the *Uneedus* action.

However, also as earlier noted, we hold that the award of the $3 million in tort damages, plus the attorney's fees now otherwise recoverable per *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796] (under circumstances not present in this record), was improper: (1) because there were no permissible inferences to be drawn from the undisputed, direct evidence such as could factually establish liability for such damages; (2) because of the speculative nature of and hence insufficient

evidence offered to prove such damages; and (3) because of prejudicial errors in the jury instructions.

More specifically, as to the impropriety of tort damages, because of No. 1 above, based on the analysis *infra,* we hold, solely on these facts, that there was no evidence of behavior attending Royal Globe's breach of its duty to defend showing any tortious behavior by Royal Globe amounting to a breach of the implied covenant of good faith and fair dealing. We do *not* hold that breach of the duty to defend can never, under any circumstances, be accompanied by other behavior such as would constitute the tort of bad faith in addition to the breach of contract. Such a holding is not necessary to our decision here, and we expressly disclaim it. Likewise, we do *not* hold, if such a disclaimer be necessary, that liability in tort for breach of the implied covenant of good faith and fair dealing can only be proved by direct evidence.

Otherwise, on the cross-appeal, we hold that the trial court properly struck the exemplary damages because, as the trial court observed, in light of the undisputed evidence, and the only permissible inferences to be drawn therefrom, that there was no egregious conduct by Royal Globe, within the ambit of Civil Code section 3294, for which the jury could have properly awarded such damages.

I

BREACH OF THE CONTRACTUAL DUTY TO INDEMNIFY

It is Royal Globe's contention, under the terms of the policy, that the undisputed facts do not provide the occasion for it to indemnify California Shoppers for the *Uneedus* judgment, this for the reason that California Shoppers engaged in certain statutory unfair trade practices which led to that judgment.

Stated in the language of Royal Globe's black-letter point I in its opening brief, "Plaintiff's willful violation of a penal statute with intent to injure its competitor precludes it from receiving any insurance benefits." In its brief, Royal Globe continues, "Applying the reasoning of these authorities to the instant action, it is plainly evident that Royal has no duty to indemnify California Shoppers for the damages awarded in the *Uneedus* action. California Shoppers' selling of advertising space below cost and its giving away of free reader advertisements, with the intent to destroy and injure the business of Uneedus, fall squarely within the definition of a 'willful' act."

Otherwise, Royal Globe points to section 533 of the Insurance Code which provides that, "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others." Royal Globe argues, under either the terms of the policy or the provisions of section 533, that it has no legal obligation to indemnify California Shoppers for what the latter paid to satisfy the *Uneedus* judgment.

Both contentions are unmeritorious. The *Uneedus* action against California Shoppers was in the nature of a *civil* antitrust action brought pursuant to Business and Professions Code section 17043 and the judgment imposed was in the nature of a civil remedy, i.e., damages. The fact that the Unfair Practices Act provides for penal sanctions as well (Bus. & Prof. Code, § 17100) underscores the characterization of the underlying action here as civil rather than penal. California Shoppers was neither charged with nor convicted under any "penal statute or ordinance" and no court has made such a finding. ■ "[T]he burden of bringing itself within any exculpatory clause contained in the policy is on the insurer (*American Home Assurance Co.* v. *Essy,* 179 Cal.App.2d 19, 23 [3 Cal.Rptr. 586])." (*Executive Aviation, Inc.* v. *National Ins. Underwriters* (1971) 16 Cal.App.3d 799, 806 [94 Cal.Rptr. 347].) ■ Royal Globe has failed to carry this burden and to demonstrate that the policy's language, according to its literal terms, excludes coverage of the treble damages.

■ As for Insurance Code section 533, Royal Globe ignores the "clear line of authority in this state to the effect that even an act which is 'intentional' or 'willful' within the meaning of traditional tort principles will not exonerate the insurer from liability under Insurance Code section 533 unless it is done with a 'preconceived design to inflict injury.'" (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 887 [151 Cal.Rptr. 285, 587 P.2d 1098], citing *Walters* v. *American Ins. Co.* (1960) 185 Cal.App.2d 776, 783 [8 Cal.Rptr. 665].) More specifically, as the court in *Capachi* v. *Glens Falls Ins. Co.* (1963) 215 Cal.App.2d Supp. 843, 849 [30 Cal.Rptr. 323], pointed out, "the word 'wilful' as used in [§ 533] may be said to connote an act done with malevolence." Other courts have suggested that the culpability contemplated within the term "wilful tort" as used in section 533 is synonymous with "malice in fact," i.e., a wish to vex, annoy, or injure another person. (See, e.g., *City Products Corp.* v. *Globe Indemnity Co.* (1979) 88 Cal.App.3d 31, 36, fn. 3 [151 Cal.Rptr. 494].)

Consistent with the requirement of a specific intent to injure, the courts have recognized an exception to the rule that section 533 precludes coverage of exemplary damages where the prohibited acts are attributable to the in-

sured *vicariously.* (See *Arenson* v. *Nat. Automobile & Cas. Ins. Co.* (1955) 45 Cal.2d 81, 84 [286 P.2d 816].) A similar exception has been made where the insured acts intentionally but without malice. Thus, in *Capachi* v. *Glens Falls Ins. Co., supra,* 215 Cal.App.2d Supp. 843, the insured was found liable for false arrest, but the jury also found that the insured had acted without ill will or intent to injure, i.e., without malice. Accordingly, the *Capachi* court ruled that section 533 did not exclude coverage for the damages. (*Id.,* at p. 849.)

The rule which emerges from the cited cases is: Insurance Code section 533 clearly excludes coverage of those "wilful" acts committed with the specific intent to injure, but not those nonmalicious acts committed with the sole intent to do the act which caused the harm.

 In light of the foregoing, it is evident that section 533 does not exclude coverage of the treble damages imposed here. The trial court in the *Uneedus* action specifically found that "the acts of the defendants [California Shoppers] were not done with malice or oppression towards [Uneedus] nor were they of such magnitude to warrant the imposition of treble damages."

This court later ruled that the trial court had erred in failing to award treble damages because such damages are *mandatory* under Business and Professions Code section 17082, irrespective of whether California Shoppers acted with malice.

However, the mandatory award of treble damages under Business and Professions Code section 17082 is an issue separate and apart from the question of whether California Shoppers acted with the requisite malice to invoke the exclusion of section 533.

California Shoppers was found to be liable for the treble damages, because the "purpose to harm" requirement under section 17043 may be *presumed* solely from the act of selling below cost together with proof of the injurious effect of such act. (Bus. & Prof. Code, § 17071; *Tri-Q, Inc.* v. *Sta-Hi Corp.* (1965) 63 Cal.2d 199, 208 [45 Cal.Rptr. 878, 404 P.2d 486].) Liability attaches when the evidence shows that a defendant intended to do the act of selling below cost in order to attract customers, and in the process caused an injurious effect to his competitors. (See McCarthy, *Whatever Happened to the Small Businessman? The California Unfair Practices Act* (1968) 2 U.S.F.L.Rev. 165, 192-193.)

Although California Shoppers was found to be responsible for damages under the statute, the absence-of-malice finding by the court in the *Uneedus*

action conclusively established that California Shoppers did *not* pursue a "preconceived design to inflict injury" (*Clemmer* v. *Hartford Insurance Co., supra,* 22 Cal.3d 865, 887). Therefore, section 533 did not exclude coverage of the exposure for which California Shoppers was assessed treble damages.

Beyond the statutory exclusion contained in section 533, however, Royal Globe argues that the public policy of this state, as articulated in numerous court decisions, prohibits insurance coverage for exemplary damages. It has frequently been observed that to allow offenders to shift liability for exemplary damages to their insurers would undermine the theoretical purposes of such damages, i.e., to punish the offender and to deter others from engaging in like conduct. (*Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 155 [181 Cal.Rptr. 784, 642 P.2d 1305]; *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 409 [89 Cal.Rptr. 78, 47 A.L.R.3d 286]; *City Products Corp.* v. *Globe Indemnity Co., supra,* 88 Cal.App.3d 31, 41.)

However, where the primary purpose of multiplying damages is to provide additional compensation to the victim rather than to punish the offender, it can hardly be maintained that extending insurance coverage to such multiple damages undermines the theoretical purpose of exemplary damages or offends public policy.

Because neither the insurance policy itself nor the statutes and public policy of this state preclude coverage for the treble damages, it necessarily follows that Royal Globe had and continues to have a duty to indemnify California Shoppers for the full amount of the *Uneedus* judgment.

Having defined the duty to indemnify, an issue of law, we hold there is no question of breach here as an issue of fact. Royal Globe has not indemnified California Shoppers for the *Uneedus* judgment, declining to do so, of course, on the ground that it has no legal duty to do so.

Turning to damages arising from the breach, James Coffran, already identified as a principal of California Shoppers, testified that he paid Uneedus a total of $89,000. The coverage here applicable under the policy provided for a $2,500 deductible. We assume that this was the reason the jury awarded $86,500 here instead of what California Shoppers actually paid to satisfy the *Uneedus* judgment.

In sum, as damages for breach of the duty to indemnify, the jury rightly awarded California Shoppers $86,500, plus prejudgment interest of

$21,963, calculated from the time the indemnity should have been paid up to the date of the judgment.

▮ Before leaving this point, it is appropriate to consider, as it applies here, Royal Globe's contention that it was error for the trial court to submit to the jury the task of interpreting provisions of the insurance policy. Such contention, based on section 310 of the Evidence Code, is well taken. That section reads, in pertinent part, "All questions of law (including but not limited to questions concerning the construction of statutes and other writings . . .) are to be decided by the court." Applying this statute, it is well established that the interpretation of written contracts, including insurance policies, is an issue of law to be decided by the court and not the jury. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) In light of the foregoing, on the issue of coverage, Royal Globe challenges the propriety of California Shoppers' instructions No. 10, No. 17, No. 18, No. 19 and No. 20. Academically, Royal Globe is right in its challenge.

However, no prejudice resulted from the erroneous instructions. On the uncontradicted, direct evidence, there is no dispute about what happened. California Shoppers' conduct was fully exposed and litigated in the *Uneedus* action and was the subject of findings by that trial court. As a consequence, Royal Globe's liability on the coverage issue, solely an issue of law, should have been the subject of a motion for a directed verdict, or, more logically, of a motion for partial summary adjudication in advance of the trial for the reasons already set forth in our legal interpretation of the policy coverage. In other words, the jury, in applying the instructions to the undisputed facts, reached the same result as the law-imposed duty dictated anyway.

In view of our discussion and holding on the issue of coverage, it necessarily follows that the trial court's denial of the motion for judgment notwithstanding the verdict on this point was correct, and the judgment thereon will be affirmed.

## II

### BREACH OF THE CONTRACTUAL DUTY TO DEFEND

▮ Now, we take up Royal Globe's contention that this duty as such was not breached. The applicable provision of the policy reads "(A) The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury or advertising offense sustained by any person or organization and arising out

of the conduct of the named insured's business . . . and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury or even if any of the allegations of the suit are groundless, false or fraudulent . . . ."

Defining the nature of the duty to defend ordinarily requires first a legal interpretation of the applicable policy provision. In this regard, the usual observation, as a result, is that the duty to defend is broader than the duty to cover. In the case here, however, Royal Globe never reached the point of having to make this differential evaluation. It declined to accept tender of the defense, ostensibly by Adco, based solely on the fact that Adco was not a defendant in the *Uneedus* action. As earlier noted, Scott testified, "Well, if you realize the specifics of it . . . I could not set up a claim under Adco's policy since they were not a party to the action."

Actually, Royal Globe argues that it did not breach its duty to defend, urging in particular that an absence of notice to Royal Globe and/or California Shoppers' failure to exercise due diligence in making inquiry as to why coverage was denied, operated to preclude even raising Royal Globe's duty to defend. We do not agree.

We have already variously noted that the direct evidence of how transmittal of the *Uneedus* summons and complaint was handled went undisputed. After California Shoppers was served, the summons and complaint were mailed to the insurance agent, Jay and Renfro, with no covering letter of explanation and in an envelope imprinted in the upper left-hand corner with the name "Adco" above its return address. Upon receipt of summons and complaint thus transmitted, Jay and Renfro reached the conclusion that the mailing had been from Adco, and, in forwarding the papers to the Tustin claims office of Royal Globe, *affirmatively stated* in a covering letter that the defense had been tendered by Adco, and referenced Adco's policy number.

As a result of his checking the Adco policy, Scott wrote to Adco under date of June 6, 1975, as quoted earlier in our synopsis of the facts, i.e., that such policy provided no coverage, meaning implicitly: you have not been sued, and California Shoppers is not covered by your policy. Thus, it is undisputed, as a matter of direct evidence, plus the only permissible inferences to be drawn therefrom, that Royal Globe's claims manager did not by means of the letter of June 6, 1975, actually refuse to provide California Shoppers a defense to the *Uneedus* action; he declined to provide Adco such defense based on the mistaken belief that it had sought such defense. However, that is not dispositive on the issue.

The question remains as to whether the contractual duty imposed by the terms of California Shoppers' policy called upon Scott to do more than he did. A clue can be found in Scott's own testimony also earlier quoted. At the trial, in trying to answer, when he had no specific recollection of how he had handled this matter but could recall the routine generally followed in such instances, he testified that "it probably would have struck me as very strange that the policy was sent to me as Adco Advertising and yet they were not a named defendant."

We hold that the facts confronting the claims manager Scott were such as to put him on notice of the contractual duty to make a further inquiry. If he had made this further inquiry, he would have discovered that it was actually California Shoppers who had tendered the summons and complaint for defense, and then Royal Globe would have offered to defend as it finally did a year or so later when it was served in this action. In the aggregate, this represents a classic case of constructive notice which raised the contractual duty to defend. In other words, given the appropriate circumstances, the law will charge a party with notice of all those facts which he might have ascertained had he diligently pursued the requisite inquiry. (See Civ. Code, § 19 defining constructive notice, and *Sterling* v. *Title Ins. & Trust Co.* (1942) 53 Cal.App.2d 736, 748-749 [128 P.2d 31], citing cases in which parties are charged with constructive notice because their situations impose a duty to pursue the inquiry suggested.) In short, the duty to defend, ordinarily arising after receipt of actual notice to do so, arose here upon receipt of constructive notice.

This contractual duty to inquire further, provided the legal framework within which the jury found that Royal Globe had breached its duty to defend, for, of course, there was no question on the evidence but that Royal Globe did not provide a defense to the *Uneedus* action in June of 1975.

Notably, however, as will figure in our analysis of the bad faith issue, *infra,* we observe parenthetically that there was no direct evidence, including permissible inferences to be drawn therefrom, of a conscious decision on Royal Globe's part to repudiate its duty to defend California Shoppers, a party not identified to Scott as the one seeking a defense. The mixup, according to undisputed evidence, arose solely as a result of Royal Globe's mistaken belief that Adco had no exposure in the *Uneedus* action. Moreover, this mistake had been induced by California Shoppers because of the way it had forwarded the summons and complaint to Jay and Renfro. They were also named as defendants, but the jury here exonerated Jay and Renfro as the cause of any damages.

As for California Shoppers' supposed duty to inquire why coverage had been denied, Royal Globe argues that "the insurance contract imposes a duty of good faith and fair dealing on the insured, as well as the insurer," (citing *Samson* v. *Transamerica Ins. Co.* (1981) 30 Cal.3d 220, 240 [178 Cal.Rptr. 343, 636 P.2d 32]), and that "[t]he only logical reason for plaintiff choosing not to respond to the letter from [defendant] was its desire to attempt to create a bad faith scenario in this case." However, Royal Globe points to no authority supporting its argument that California Shoppers had a *duty* to inquire why coverage was *denied*, and it ignores the fact that this alleged duty arose only because, in the first instance, it never inquired of Adco why defense and coverage were *sought*. ■ In any event, the principle, that any duty to provide notice which an insured owes its insurer ceases when the insurer denies coverage (*Samson* v. *Transamerica Ins. Co.*, *supra*, 30 Cal.3d 220, 238), applies here even though one step removed, i.e., even though the denial of coverage was as to Adco and not California Shoppers, providing the basis for *constructive notice* of the claim to Royal Globe.

■ In sum, because Royal Globe, after constructive notice, breached its contractual duty to make the necessary inquiries which would have led to its offer to defend California Shoppers in the *Uneedus* action, as it offered in August of 1976, regardless of the coverage issue, the jury's verdict (that Royal Globe was not excused from performing that duty by any of California Shoppers' acts or omissions with reference to the fact of notice) must stand.

■ Here again, by way of digression, it is necessary to address Royal Globe's contention that interpretation of the insurance contract (here, as to the duty to defend) was improperly submitted to the jury. As noted under point I, interpretation of the policy is not a question of fact to be decided by the jury; it is a question of law. As a consequence, Royal Globe's contention that portions of instruction No. 30 were improper is also well taken on the contractual duty-to-defend issue.

However, no prejudice resulted from giving the faulty instruction, for there is no question, as a matter of legal interpretation, that the policy terms plus the constructive notice of California Shoppers' tender raised a duty to defend the *Uneedus* action. In other words, it was not prejudicial to Royal Globe that the jury was afforded an opportunity to find a duty to defend which we hold was present anyway under the terms of the policy.

■ The consequences of breach of the duty to defend are set forth in *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654 [328 P.2d

198, 68 A.L.R.2d 883]. "Where there is no opportunity to compromise the claim and the only wrongful act of the insurer is the refusal to defend, the liability of the insurer is ordinarily limited to the amount of the policy plus attorneys' fees and costs." (*Id.*, at p. 659.)

 There was no opportunity afforded Royal Globe to settle with the third-party claimant before trial, and there were no policy limits. Thus, the application of the foregoing rule to the facts here is so evident a proposition that Royal Globe has conceded, if in fact there were a breach of the duty to defend, that it is obligated to pay the attorney's fees California Shoppers incurred in defending the *Uneedus* action. The evidence shows without dispute that such fees amounted to $39,000, and so the trial court's denial of Royal Globe's motion for judgment notwithstanding the verdict on this point was correct; thus, the judgment thereon will be also affirmed.

### III

### OTHER DAMAGES AWARDED

This brings us to a discussion of the latter three items of damage awarded by the verdict. Referring to the verdict numbers, such other damages awarded, *after* the order on the motion for judgment notwithstanding the verdict, were: (3) so-called past inflation loss, $50,000; (4) attorney's fees incurred by California Shoppers in procuring benefits due under the policy, $59,493; and (5) damages for economic or business loss, $3 million.

### A. *The $50,000 Past Inflation Loss*

 With reference to its possible liability to indemnify California Shoppers for the *Uneedus* judgment and for the cost of the defense leading to it, Royal Globe contends that to allow California Shoppers recovery for past inflation loss, in addition to prejudgment interest, amounts to a double recovery. On the other hand, California Shoppers argues that these two awards do not constitute a double recovery. More particularly, it urges that the purpose of an award for past inflation loss is to compensate for the decline in the value of money during the interval between the breach of the obligation to pay and when that breach is translated into a judgment. It argues, as to prejudgment interest, that such interest is awarded to compensate for the loss of the *use* of money for so long as it is denied the use of the money. The implication of course, is that these two purposes are different. We agree at least as to periods when the rate of inflation exceeds the legal interest rate.

In this connection, a part of California Shoppers' instruction No. 7, which was given with reference to Royal Globe's duty to indemnify, included a direction to the jury that, "your award for such loss shall reflect any loss attributable to a diminution in the purchasing power of the dollar." No authority was cited to the court for the instruction quoted, and in our view it was wholly inappropriate.

It is axiomatic that damages are awarded to make a plaintiff whole for legally recoverable losses it has incurred at the hands of a defendant. The seeming theory behind the giving of the instruction quoted is that a plaintiff, by not having the money in hand when legally it should have had it, suffered a loss measured by the decline in the dollar's purchasing power during the interval between when the duty to pay arose and when payment was received. However, to prove a plaintiff has *actually* incurred a true economic loss for such reason, it would be necessary to show, if the dollars had been received at the time a plaintiff was entitled to have received them, that it possessed the requisite investment opportunities, skills, and acumen to manage that money in such a way as to produce a yield that would have at least kept pace with the rate of inflation.

Without such a showing, there is no logical basis to argue that California Shoppers had suffered a loss attributable to inflation. Suppose the money had been paid when due, and suppose California Shoppers just put the money in a safe or in a noninterest bearing checking account at its bank. Time marched on; the rate of inflation soared. Can it be said that the decline in the value of California Shoppers' money was "caused" by Royal Globe? Certainly not. Thus, before there can be any asserted loss attributable to the so-called inflation factor, the investment skill of a plaintiff plus its opportunities to exercise that skill, so as to keep pace with inflation, must be demonstrated. If we are to apply here the orthodox theory of damages adhered to for centuries, simple logic demands nothing less.

The instruction given on this subject neglected entirely an obvious requirement. More importantly, in any event, there was absolutely no evidence offered to demonstrate the presence of these indispensable elements in proving such damages. If there had been such evidence, this item of the verdict might have been salvaged; however, there was none. As a consequence, the postjudgment order on this item was incorrect, and the judgment must be modified accordingly to delete such item.

B. *The $59,493 in Attorney's Fees to Procure Policy Benefits*

California Shoppers' instruction No. 9, which was given as requested, included the following: "If you find liability against defendant Royal Globe

on the theory of breach of implied covenant of good faith and fair dealing in addition to the above damages you must award plaintiff attorneys' fees necessarily incurred by plaintiff California Shoppers and reasonably required to secure any benefits owing under the insurance policy."

Assuming for purposes of discussion only, entitlement to damages for bad faith, after sufficient proof of liability for such a tort, until recently there had been a conflict of authority in California as to whether attorney's fees to obtain policy benefits were also recoverable by the insured as an item of damages in actions in which there had been a finding that the insurer had also incurred tort liability. That conflict has now been resolved by the Supreme Court in *Brandt* v. *Superior Court, supra,* 37 Cal.3d 813, in which the court held that insured parties may recover fees expended to win policy benefits, where there has been tortious conduct by an insurer, because such fees are deemed to be a part of the damages proximately resulting from the tort of bad faith.

Under this rule, California Shoppers, because it was seeking policy benefits, would have been entitled to recover such attorney's fees as tort damages had there also been sufficient proof of tort liability. However, as we shall soon explain, as a matter of law, on the basis of the undisputed, direct evidence, plus permissible inferences to be drawn therefrom, California Shoppers failed to prove that Royal Globe had engaged in any tortious behavior in connection with its failure to defend the *Uneedus* action on behalf of California Shoppers. As a consequence, the trial court's denial of the postjudgment motion on this item was incorrect, and the judgment must be modified accordingly to delete the attorney's fees item of damages.

## C. *The $3 million in Damages for Economic Loss*

In scrutinizing the propriety of this item of the jury's award, the task breaks down into at least six major areas of analysis. The first is to identify with particularity the theories of liability which California Shoppers has purportedly invoked, both by the allegations of its complaint and by its arguments in support thereof.

The next step is to review the evidence adduced to prove each of the theories, and, in connection with this phase of the opinion, because the direct evidence was undisputed, such review necessarily will include an exposition of the law governing resort to inferences in aid of the factfinding process.

The third step will be to marshal the legal authorities properly applicable to the evidence, more particularly, in light of the evidence, to identify the

legal duties actually imposed under the theories which California Shoppers undertook to invoke against Royal Globe.

The fourth step will consist of an analysis of the sufficiency of the evidence offered to prove damages, without regard to whether liability has been proved. This follows necessarily, for even if liability be proved, no recovery is permissible unless there is proof by competent evidence of actual damages suffered, as opposed to speculative damages.

The fifth step in the analysis will be to consider the jury instructions. For such instructions to be proper, they must reflect a viable legal theory framed by the pleadings and logically applicable to the factual record developed during the trial.

The final step will be to consider and comment on whether other errors occurring at the trial were prejudicial.

### 1. *California Shoppers' Theories of Tort Liability*

In broad, general terms, California Shoppers' fundamental theory of liability in tort is that Royal Globe, in connection with breach of its contractual duty to defend, otherwise acted or omitted to act in such a way that it also breached the implied covenant of good faith and fair dealing imposed upon it by the relationship of the parties as insured and insurer.

More explicitly, in paragraph VIII, found in the first count of California Shoppers' first amended complaint, it is alleged with reference to when Scott wrote the letter of June 6, 1975, that "defendant Royal Globe Insurance Company at the time of this denial [to accept tender of defense of the *Uneedus* action] actually knew the Uneedus defendants involved, and the charges and allegations of the complaint." California Shoppers then went on to allege that "the defendant Royal Globe Insurance Company *wilfully* and *intentionally* refused to do any investigation to determine that California Shoppers was an insured covered under [its] policy and entitled to a defense by Royal Globe." (Italics added.) In paragraph X, also in the first count of the first amended complaint, California Shoppers continued, "Defendants [*sic*] failure to adhere to its contractual obligation to tender a defense, and provide coverage, to plaintiff in regard to the aforesaid Complaint of Uneedus for unfair competition, knowing that plaintiff is entitled to said defense under the terms of its Special Multi-Peril Insurance Policy (at a time when defendant knows that the plaintiff is a new business financially unable to afford payment of attorneys' fees to defend against the said unfair competition lawsuit) constitutes an unreasonable failure to provide benefits due

under the subject policy, and constitutes a breach of defendant's duty to treat plaintiff fairly and in good faith. Further, defendant has *intentionally* refused to reasonably investigate the claims involved in the Unnedus [*sic*] Complaint. Defendant has *intentionally* refused to accord the plaintiff a tender of defense, and/or provide coverage, for a lawsuit involving unfair competition as provided by the Special Multi-Peril Insurance Policy here in issue, *knowing* that plaintiff's claim for a tender of defense, and coverage, is completely valid. Defendant *consciously* and *knowingly* by said wrongful conduct has caused plaintiff to incur attorneys' fees and costs (and thereby save itself making these expenditures) in defense of said action for unfair competition, and has inflicted financial hardship and burden upon said plaintiff, all to plaintiff's general damage in a sum in excess of that required for jurisdiction in the Superior Court of the State of California. as shown by proof at time of trial.'' (Italics added.)

In sum, California Shoppers' theory of liability, in the first instance, i.e., of what was tortious here, was that Scott actually knew that plaintiff California Shoppers was seeking a defense to the *Uneedus* action, but nevertheless wilfully declined to provide such defense.

As a kind of alternative to the theory just noted, California Shoppers argues that it was unreasonable for Scott not to conduct some sort of investigation which would have led to his discovery that actually it was California Shoppers and not Adco seeking defense of the *Uneedus* action. In other words, although California Shoppers has alleged and argued that Scott consciously realized that California Shoppers had tendered the defense but nevertheless refused to accept such defense, it argues, otherwise, even if Scott did not know that California Shoppers had tendered the defense, the circumstances were such that he should have made a few inquiries, and, because of this failure to make such investigation, that there was thereby provided another basis in tort for the jury to find a breach of the implied covenant.

California Shoppers' third theory of liability is based upon the meeting of counsel Harding, Odgers and Ibold, along with James Coffran, in August of 1976 and Odgers' letter to Ibold of September 3, 1976.

It is suggested that Royal Globe's reaction to the letter in September of 1976, i.e., a failure to respond to it, either was itself tortious or confirmed Scott's allegedly tortious behavior a year earlier. As we read California Shoppers' contention on this point, it amounts to an argument that Royal Globe, for a second time, refused to accept tender of the defense. What California Shoppers points to in support of such argument is that neither

Royal Globe nor its counsel Ibold *responded* to Odger's letter. In our view, Royal Globe was not required to answer (*infra*).

### 2. *Evidence of Tort Liability*

Before undertaking an analysis of California Shoppers' evidence of tort liability, it is appropriate to point out, in the main, that this is not an "evidence" case in the ordinary sense. By this we mean that we will not be routinely engaged in a search for conflicts in the direct evidence; there are none. In this connection, the dissent has charged that we have turned the substantial evidence rule "on its head." Such a charge fails to take into account a routine appellate function. When the direct evidence is undisputed, as it is here, it then becomes the function of the court, as a matter of law, to determine what inferences may be permissibly drawn from that direct evidence (*infra*), and that is what we have done.

Because this kind of exercise characterizes the analytical task in assessing the propriety of the award of tort damages, a commentary on the legal basis for resort to inferences in the factfinding process and a citation of the rules governing appellate review thereof are in order at this point in the discussion.

As earlier noted, the so-called direct evidence is undisputed. Section 410 of the Evidence Code states, "As used in this chapter, 'direct evidence' means evidence that directly proves a fact, without an inference or a presumption, and which in itself, if true, conclusively establishes that fact." Section 600, subdivision (b) of the Evidence Code states, "An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." The "deduction" referred to in the definition, of course, is as probative in resolving an issue of fact as is direct evidence. ■ In other words, "If reason and logic admit an inference to be drawn of the existence of the material facts in issue, the proponent has adduced sufficient evidence to present his case to the jury." (*Dimond* v. *Caterpillar Tractor Co.* (1976) 65 Cal.App.3d 173, 181 [134 Cal.Rptr. 895].)

Otherwise, in undertaking to resolve issues of fact by resort to inferences, the question implicit in that part of the definition which states that an inference of fact is one "that may logically and reasonably be drawn . . . ." is: *who* is to decide whether a given inference can or cannot be drawn? In a case decided by this court, *Marshall* v. *Parkes* (1960) 181 Cal.App.2d 650 [5 Cal.Rptr. 657], in connection with a discussion of inferences, we said, "[w]hether a particular inference can be drawn from certain evidence is a

question of law for determination by the court, but whether the inference shall be drawn, in a given case, is a question of fact for determination by the trier of fact." (*Id.*, at p. 655, citing *Blank* v. *Coffrin* (1942) 20 Cal.2d 457, 461 [126 P.2d 868].)

*Marshall* stated further ". . . where the uncontradicted evidence 'establishes the impropriety of the inferences drawn by the [jury] from the uncontroverted facts,' a finding based thereon is not supported by the evidence." (*Marshall* v. *Parkes, supra,* 181 Cal.App.2d 650, 655, citing *Estate of Tarrant* (1951) 38 Cal.2d 42, 51 [237 P.2d 505, 28 A.L.R.2d 419].)

 Finally, as a matter of general commentary on the rules characterizing the availability of inferences in the factfinding process, the court in *Brautigam* v. *Brooks* (1964) 227 Cal.App.2d 547 [38 Cal.Rptr. 784], said, "In *Estate of Kuttler,* 185 Cal.App.2d 189, 204 [8 Cal.Rptr. 160], we stated that an inference 'cannot be based upon mere possibility,' citing among others, *Eramdjian* v. *Interstate Bakery Corp.,* 153 Cal.App.2d 590 [315 P.2d 19], and continued:

" 'The *Eramdjian case, supra,* at page 602, says: "A legal inference cannot flow from the nonexistence of a fact; it can be drawn only from a fact actually established. (Code Civ. Proc., §§ 1958, 1960.) It is axiomatic that 'an inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.' (18 Cal.Jur.2d 480.) . . .' "

" '*Reese* v. *Smith,* 9 Cal.2d 324, 328 [70 P.2d 933]: " 'If the existence of an essential fact upon which a party relies is left in doubt or uncertainty, the party upon whom the burden rests to establish that fact should suffer, and not his adversary. (*Patterson* v. *San Francisco etc. Ry. Co.,* 147 Cal. 178 [81 P. 531].) A judgment cannot be based on guesses or conjectures. (*Puckhaber* v. *Southern Pac. Co.,* 132 Cal. 363 [64 P. 480].) And, also, "A finding of fact must be an inference drawn from evidence rather than on a mere speculation as to probabilities without evidence. A majority of chances never can suffice alone to establish a proposition of fact, since the slightest real evidence would outweigh all contrary probabilities." (23 C.J. § 1750, p. 18.)' " ' " (*Brautigam* v. *Brooks, supra,* 227 Cal.App.2d 547, 556-557.)

We turn now to the evidence offered at the trial to prove the several theories of liability noted.

### (a) *Of Royal Globe's Alleged Wilful Refusal to Defend*

Royal Globe's claims manager Scott testified without contradiction that he believed that it was Adco which had tendered defense of the *Uneedus* action. Notwithstanding this direct evidence, counsel for California Shoppers argued that defendant "had notice from the date the claim was served." Counsel's effort to convince the jury of the foregoing was pure bombast. His purported logic defies credulity. His argument was to the effect that Royal Globe had sold insurance to California Shoppers, opened a file on California Shoppers as an insured, and accepted payment of a premium. This recitation led to his statement "this seems to say they know you've got a complaint against California Shoppers." He went on to discount the significance of the evidence that the claims manager Scott had received the summons and complaint, via Royal Globe's Tustin claims office, from the agents Jay and Renfro with a covering letter stating that *Adco was seeking a defense* and coverage. Plaintiff's counsel called this evidence a "red herring."

The direct evidence noted was not a "red herring." It is a significant part of the predicate for determining what inferences could permissibly be drawn by the factfinder. In our view, as we later explain, there was no occasion presented for the jury permissibly to infer that Royal Globe's claims manager Scott, at the time he wrote the letter of June 6, 1975, actually realized that the summons and complaint sent to Jay and Renfro in the Adco envelope, without a cover letter of explanation, had in fact been sent by California Shoppers and not Adco.

This is one of the points of our divergence from the dissent. The dissent buys into California Shoppers' theory that Royal Globe's claims manager actually knew, at the time he wrote the letter, that in fact it was California Shoppers who had sought a defense and coverage for the *Uneedus* action. The dissent even goes so far as to speculate that the jury could have disbelieved Scott and thus concluded that he knew or had reason to believe that California Shoppers was insured by Royal Globe. A fair reading of the testimony of Roy Gibson, manager at Jay and Renfro's, already quoted, leads to just the opposite inference. When Gibson was asked about conversations with Scott as to whether Royal Globe was going to accept or reject coverage, Gibson's answer was "I don't remember." Later on, Gibson was again questioned about whether there was any understanding that California Shoppers was insured by Royal Globe. He answered, "It was never brought up." The questioning persisted. Gibson was asked whether California Shoppers was an insured of Royal Globe's in May of 1975. He answered, "With us, no. I had never heard of California Shoppers." Counsel would not give

up. He asked again a few pages later, "When Royal Globe advised you that there was no coverage, did you call anybody on behalf of Adco or Herb Sutton for the purpose of investigating or determining who California Shoppers was?" Gibson answered, "California Shoppers had never even been mentioned." Thus, there was absolutely nothing in Gibson's testimony, regarding his conversations with Scott, even remotely to suggest that Scott knew that California Shoppers had tendered defense of the *Uneedus* action.

As for Scott's testimony, it was consistent with Gibson's. When Scott was asked if he had denied coverage to everybody, he answered, "I denied it to Adco." Mr. Hafif could not shake that testimony. While we are not in a position to evaluate Scott's demeanor as a witness, we can observe from a reading of the cold record that there is nothing there to suggest evasion or dissembling.

This was the uncontradicted, direct evidence on the factual issue of whether Scott knew it was California Shoppers and not Adco which had sought a defense to the *Uneedus* action. Accordingly, *for the jury to have found that Scott had such knowledge, it would have had to have been inferred.*

As earlier explained, just what inferences can permissibly be drawn by the factfinder are questions of law. In approaching this precise decisional task, the starting point, to reiterate, is section 600, subdivision (b) of the Evidence Code, which, in defining an inference, states that it may "logically and reasonably be drawn . . ." We interpret this language to mean also that an inference may *not* be illogically and unreasonably drawn.

Otherwise, the cases earlier cited teach that an inference cannot be based on a mere possibility and cannot flow from suspicion alone, or from imagination, speculation, supposition, surmise, conjecture or guesswork.

Seeking other legal guidelines for performing the court's task of deciding what inferences may permissibly be drawn, section 3545 of the Civil Code recites the legal maxim that "Private transactions are fair and regular." This maxim in substance at one time was tabulated among the presumptions in old section 1963 of the Code of Civil Procedure. Since the Evidence Code was adopted in 1967, the maxims, as now constituted, do not carry the weight of presumptions. Even so, in its current form, section 3545 clearly imports the proposition that the law does not condone inferences of improper purpose in the absence of direct evidence to support such inferences.

Thus, to the more general admonitions that inferences must be logical and reasonable can be added the legal guideline in the factual context here that

absence of "proper cause" (*infra*) cannot be inferred unless there is some direct evidence upon which to base such an inference. For the jury to have found Scott's behavior tortious, it would have been necessary to attribute to him, first, knowledge that California Shoppers was seeking defense of the *Uneedus* action, and second to find an absence of "proper cause" in declining to accept the case for defense, all as explained *infra*.

Therefore, because there is no direct evidence from which the jury could logically and reasonably infer that Scott had identified California Shoppers as the party tendering defense of the *Uneedus* action, and particularly because there was no direct evidence that Scott wrote the letter of June 6, 1975, with any absence of proper cause in mind, we hold that the jury here could not permissibly have drawn the inference of such knowledge, or of an absence of proper cause.

This brings us to consider the suggestion that the jury could have disbelieved Scott when he testified that he did not realize that it was California Shoppers and not Adco which had tendered defense of the *Uneedus* action. This suggestion provides the basis for California Shoppers' argument that such disbelief could *itself* have supported an inference that Scott *did* know that California Shoppers had tendered the defense.

The law is to the contrary. If a witness testifies, for instance, that *it was not raining* at the time of the collision, and if the jury disbelieves that testimony, such disbelief does not provide evidence that it *was raining* at the time of the collision. This proposition was applied in *Estate of Kuttler, supra*, 185 Cal.App.2d 189. That case involved the interpretation of a power of appointment contained in the decedent's holographic will, particularly the meaning of the word "belongings" as recited in the power of appointment. Such interpretation controlled the question of whether the decedent died partially intestate as to her real property and intangible personal property, a result which would follow if "belongings" were defined to mean only tangible personal property.

The trial court reached that interpretation, and the appeal which followed included an issue of whether there was evidence to support the interpretation placed on the word "belongings" by the factfinder. The testimony of those given the power of appointment by the holographic will militated toward an interpretation that "belongings" included the decedent's entire estate and that there was no intestacy. In this connection, the opinion states, "It is argued that the testimony of attorney Beatson and appellants . . . was properly disbelieved on the ground of interest in the case. Let that be conceded for the purpose of further discussion. *Rejection of their testimony does not*

*create evidence to the contrary of what is thus discarded."* (*Estate of Kuttler, supra,* 185 Cal.App.2d 189, 198, italics added.) After an extended discussion of many of the propositions concerning what can provide the basis for inferences in the factfinding process, the court concluded that there was no other evidence in the record beyond speculation as to what the testatrix meant by the word "belongings." It then said, "It thus appears that the hiatus in proof created by a rejection of the testimony of Beatson [and appellants] has not been filled with substantial evidence and the presumption against intended partial intestacy stands." (*Id.,* at p. 205.)

In other words, with no evidence otherwise of testatrix' intent that she dispose of only her tangible personal property, disbelief of the adverse parties' testimony as to facts showing an intent to dispose of all of her estate by the testatrix did *not* provide evidence to the contrary. As a consequence, the presumption applicable stood unrebutted, and the judgment was reversed.

This was not a new or novel proposition when applied in *Kuttler.* In *Hicks* v. *Reis* (1943) 21 Cal.2d 654 [134 P.2d 788], the Supreme Court had occasion to apply this same rule. In *Hicks,* one of the key issues in an automobile collision case was whether the adverse vehicle had been driven with consent of the owner, one of the defendants. As stated by the court, "[t]he real question, therefore, is whether there is any evidence, or inference from the evidence, to support the finding that [the driver defendant] was using the car with the permission of [the appealing owner-defendant] at the time of the accident." (*Id.,* at p. 659.)

After reciting the well-settled rule that if the evidence shows that an automobile was being driven by an employee of the owner at the time of the accident, the jury may infer that the employee was operating the automobile with the permission of the owner, the court went on to discuss several propositions applicable to the jury's role in such cases. In concluding this commentary, the court said, with reference to the factfinder's exclusive province of judging the credibility of witnesses, " '[I]f they do refuse [the testimony] credence [this testimony] is of no more effect than if it had not been given. It disappears from the case and the inference opposed to it is no longer contradicted.' " (*Hicks* v. *Reis, supra,* 21 Cal.2d 654, 660, quoting from *Market Street Ry. Co.* v. *George* (1931) 116 Cal.App.572, 576 [3 P.2d 41].) As a result, because the trial court disbelieved the testimony militating in favor of no consent by the owner, the inference of such permission remained unrebutted and was dispositive of the appeal.

So it is here. Above, we applied the rule of *Marshall* v. *Parkes, supra,* 181 Cal.App.2d 650, holding as a matter of law that the jury could not

properly infer that Scott, at the time he wrote the letter of June 6, 1975, knew that it was California Shoppers and not Adco which was seeking a defense for the *Uneedus* action. In view of the foregoing, because the jury's disbelief of Scott's testimony, assuming such disbelief, could not itself have provided evidence to support a finding of such knowledge, there was no avenue legally open either way for the jury to *infer* that Scott had acted tortiously when he declined to accept defense of the *Uneedus* action. Moreover, we emphasize, the foregoing rule applies regardless of whatever reason the jury may have had for disbelieving Scott. (*Hicks* v. *Reis, supra,* 21 Cal.2d 654, 660.)

To conclude this phase of the analysis, applying the other axiom from *Marshall,* already noted, ". . . where the uncontradicted evidence 'establishes the impropriety of the inferences drawn by the [jury] from the uncontroverted facts' a finding based thereon is not supported by the evidence." (*Marshall* v. *Parkes, supra,* 181 Cal.App.2d 650, 655, citing *Estate of Tarrant, supra,* 38 Cal.2d 42, 51.) In sum, with regard to California Shoppers' first theory of liability, there was no evidence that Royal Globe had tortiously declined to provide a defense to the *Uneedus* action. On this evidentiary point, the trial court, in reciting its findings at the time it ruled on California Shoppers' motion for judgment notwithstanding the verdict, stated, "It is clear from the evidence that the [defendant's employee] Scott originally denied coverage on behalf of Royal Globe to California Shoppers under the mistaken belief that California Shoppers was not an insured of Royal Globe. Scott was furnished the policy number of the Adco policy, and he was not furnished the policy number of the California Shoppers' policy. The testimony was that Royal Globe had no index by name, but relied on policy numbers."

(b) *Of Royal Globe's Asserted Failure to Investigate*

This is what we have described as California Shoppers' alternative theory of tortious behavior at the time tender of the defense of the *Uneedus* action was declined by Royal Globe in June of 1975. In analyzing California Shoppers' theory here more closely, in terms of the pleadings, its counsel's argument to the jury and in its brief, it is unclear what the actual predicate is for the assertion that Royal Globe's failure to investigate provided the basis for the jury to find that such failure was a breach of the implied covenant. There are two possibilities. The first is that Scott knew that California Shoppers, not Adco, had tendered the defense of the *Uneedus* action but nevertheless decided not to pursue whatever investigation would have been necessary to disclose that California Shoppers held a policy written by

Royal Globe and what coverages that policy contained. The second, accepting that Scott did not know the correct identity of the parties seeking a defense, is that Scott, because of the unusual circumstances confronting him, should have "investigated" the possibility that *someone else* and not Adco was actually seeking a defense.

As for the first possibility, we have already held that no permissible inference could be legally drawn that Scott had *actual knowledge* of California Shoppers' identity. That leaves only the second as a colorable possibility to be addressed. California Shoppers' reasoning in this instance appears to be that the mere showing that Scott did not look further than the Adco policy provided sufficient evidence to support a finding that such omission breached the implied covenant. In our view, such reasoning fails to take into account whether Scott breached any law-imposed tort duty at all. This point will be addressed when we discuss the authorities applicable to the actual evidence produced at the trial.

(c) *Of Royal Globe's Nonresponse to Odger's Letter*

▇▇▇▇ The third of California Shoppers' theories of bad-faith liability, regardless of the events of June 1975, is that Royal Globe received notice again of California Shoppers' tender of the *Uneedus* action for defense in August and September of 1976 but did nothing about it.

Turning to the evidence on this issue, two probative events occurred. The first was the meeting on August 30, 1976, in Harding's office, where Harding was joined by Odgers and Ibold, and for a time by one of California Shoppers' principals, James Coffran.

Ibold testified, without contradiction, that in that meeting he actually offered, on Royal Globe's behalf, to assume California Shoppers' defense of the *Uneedus* action. Ibold's recollection on this point was confirmed by Coffran's testimony, earlier quoted, "and I think the way it came out that they would, you know, that they would take over the case . . . ."

In other words, once Royal Globe had actually learned of the *Uneedus* action against California Shoppers, as a result of being served on July 7, 1976, with summons issuing in the litigation here, filed a month earlier, and once respective counsel had met, Royal Globe, through its counsel, actually offered to assume defense of the *Uneedus* action. This is the uncontradicted testimony confirmed by one of California Shoppers' own principals.

The other probative event, of course, was the letter itself, already quoted in its entirety. California Shoppers contends that this letter, along with Roy-

al Globe's lack of response thereto, is direct evidence from which the jury could and did infer that Royal Globe, in addition to breaching its contract to defend, also breached the implied covenant of good faith and fair dealing. In this connection, it is argued that there are conflicting inferences to be drawn from the letter coupled with the lack of response, and that the jury resolved these conflicts in favor of California Shoppers, with the result that its verdict for tort damages cannot properly be disturbed on appeal.

Such reasoning is totally at variance with Evidence Code section 310 and *Parsons* v. *Bristol Development Co.*, *supra*, 62 Cal.2d 861. ▨ The *Parsons* court stated that, "It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. Accordingly, 'An appellate court is not bound by a construction of the [instrument] based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence . . . .' " (*Id.*, at p. 865.)

There is no issue of credibility of extrinsic evidence here involved, and so we are free, if not duty bound, to interpret the meaning of the Odgers' letter as a routine judicial function.

In this latter connection, we emphasize that Odgers, the author of the letter, did not testify at the trial. This is the answer to any suggestion that Harding's testimony as to what happened at the meeting of August 30, 1976, is relevant in terms of resolving supposed factual issues with reference to the meaning of any terms recited in the letter. It was not. Actually, Harding did not testify as to any discussion of the $100,000 demanded by Odgers as part of the consideration for settlement of this case. Nor did he testify as to any discussion of the *Adco* action either.

Accordingly, as further stated in *Parsons*, "The interpretation of a written instrument . . . is essentially a judicial function to be exercised according to the generally accepted canons of interpretation . . . . (See Civ. Code, §§ 1635-1661; Code Civ. Proc., §§ 1856-1866.)" (*Parsons* v. *Bristol Development Co.*, *supra*, 62 Cal.2d 861, 865.) In short, the record is such that we can proceed with an interpretation of the letter because none of the facts stated as facts in the letter were extrinsically challenged by testimony at the trial.

▨ As we read Odger's letter, it does not even imply a tender to Royal Globe of defense of the *Uneedus* action, let alone saying so in so many words. The first paragraph is of no substantive significance. The sec-

ond paragraph refers only to the litigation just commenced against Royal Globe, i.e., the case here under review. The third paragraph tenders to Royal Globe defense of the suit *Adco* had just filed against California Shoppers. The fourth paragraph returns to the subject of this litigation, particularly in the form of a demand for settlement. The demand recites four specific items, none of which involves *taking over* defense of the *Uneedus* action. The fifth paragraph states that "the above things are separable," followed by puffing threats.

At page 14 of its respondent's brief, California Shoppers asserts that "separable" refers to its demand to settle this litigation, and its request that defendant assume "the" or "a" defense. *However, the only defense which was requested in the Odgers' letter was the defense of the Adco suit.*

Quoting California Shoppers' brief, "The letter confirms plaintiff's demands for settlement of the herein lawsuit. . . . Contrary to defendant's contention, plaintiff is entitled to the obvious conclusion that there were no conditions placed by plaintiff on the assumption of *the* defense [of the *Adco* suit] by Royal Globe. [¶] The demands at the meeting were for settlement of this case. The request to Royal Globe to defend the plaintiff was an entirely separate request with no strings attached. [¶] In fact, this is referenced in the letter at paragraph 2, page 2, where it is pointed out that 'the above things' settlement of the herein case and assumption of *a* defense 'are separable' requests." (Italics added.)

Accordingly, our interpretation of the letter as not constituting a tender to Royal Globe of defense of the *Uneedus* action is supported, even if unwittingly, by California Shoppers' own brief.

In any event, it is not until the sixth paragraph of Odger's letter is reached that the subject of the possible defense of the *Uneedus* action by Royal Globe is even arguably implied. There is no demand that Royal Globe take over the defense. There is only recitation of a litany of reasons why Royal Globe would *not* be permitted to. Putting the best face on the sixth paragraph from California Shoppers' standpoint, it is that Kindel & Anderson would continue to represent it regardless of who paid the attorneys.

The last paragraph then returns to a discussion of Royal Globe's exposure to liability as now pursued in this litigation. The P.S. also refers to the demand for settlement.

To summarize, Odgers' letter, fairly interpreted, recited that he was referring to three separate and distinct matters involving California Shoppers

and Royal Globe. First, he was demanding that Royal Globe accept tender of the defense of the newly-filed *Adco* suit against California Shoppers plus coverage. Second, Odgers repeated the same demand consisting of four items as proposed several days earlier for settlement of the California Shoppers' suit against Royal Globe (the one here under review). Third, Odgers was categorical in stating, with reference to the Royal Globe's offer to defend, that "I'm sure you appreciate the fact that California Shoppers does not desire to have any other [trial] counsel substituted in . . . [a]t this late stage."

As a consequence of the evidentiary state of the record and the foregoing legal interpretation of Odgers' letter, we hold that there was no direct evidence, let alone permissible inferences to be drawn therefrom, with reference to California Shoppers' third theory of liability, which would support the jury verdict for tort damages.

### 3. *Application of Precedent to the Evidence*

As earlier noted, the authorities hold that breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself. Again, as recited in *Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d 566, an insurer's responsibility to act fairly and in good faith in handling an insured's claim "is *not* the requirement mandated by the terms of the policy itself—to defend, settle, or pay. It is the obligation . . . under which the insurer must act fairly and in good faith in discharging its contractual responsibilities." (*Id.,* at pp. 573-574, italics added.)

In determining what further must appear for there to be bad faith, the cases reflect a wide variety of language, increasingly identifiable with particular categories of cases. ▮▮ After variously recognizing the rule quoted, the *Gruenberg* court said "where . . . [the insurer] fails to deal fairly and in good faith with its insured by refusing, *without proper cause,* to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing." (*Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d 566, 574, original italics deleted; italics added.) Of course, the converse of "without proper cause" is that declining to perform a contractual duty under the policy *with proper cause* is not a breach of the implied covenant. (See *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 770 [206 Cal.Rptr. 354, 686 P.2d 1158].)

Translated into more specific terms within the recognized general standard, then, *Gruenberg* stands for the proposition that, before an insured can

be found to have acted tortiously, i.e., in bad faith, in refusing to bestow policy benefits, it must have done so "without proper cause."

That this language best articulates the evolving standard against which an alleged breach of the implied covenant is to be measured is confirmed in *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910 [148 Cal.Rptr. 389, 582 P.2d 980], where the Supreme Court actually quoted the *Gruenberg* "without proper cause" language in its analysis of whether the insurer had breached the implied covenant. (*Id.,* at pp. 920-921; accord, *Hanson* v. *Prudential Ins. Co. of America, supra,* 772 F.2d 580, 584, citing *Neal* and *Gruenberg* for this proposition; *Safeco Ins. Co. of America* v. *Guyton* (9th Cir. 1982) 692 F.2d 551, 557, fn. 7.)

 To refine further the nature and extent of the duty here under analysis, in terms of a particular application of "with proper cause," it is our view that a *mistaken withholding* of policy benefits, at least where, as here, such mistake (as to the insured's identity and not as to the matter of coverage) has been contributed to by the very party claiming those policy benefits, is consistent with observance of the implied covenant of good faith and fair dealing because the mistake supplies the "proper cause."

The foregoing proposition, as it invokes the concept of mistake, has two elements. As for mistake itself, without regard to its origins, it has been held, in a context of an insurer's duty to take into account the interests of the insured as well as its own in weighing a demand for settlement within policy limits, that "[b]ad faith implies unfair dealing rather than mistaken judgment . . . ." (*Critz* v. *Farmers Ins. Group* (1964) 230 Cal.App.2d 788, 796 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142], disapproved on other grounds in *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 433 [58 Cal.Rptr. 13, 426 P.2d 173], citing *Davy* v. *Public National Ins. Co.* (1960) 181 Cal.App.2d 387, 396 [5 Cal.Rptr. 488], and *Hodges* v. *Standard Acc. Ins. Co.* (1961) 198 Cal.App.2d 564, 574 [18 Cal.Rptr. 17].)

As for the origins of the mistake, it is now well settled that the implied covenant of good faith and fair dealing "is a two-way street, running from the insured to his insurer as well as vice versa." (*Commercial Union Assurance Companies* v. *Safeway Stores, Inc.* (1980) 26 Cal.3d 912, 918 [164 Cal.Rptr. 709, 610 P.2d 1038].) Here there was no evidence disclosing the reason why California Shoppers chose to forward the *Uneedus* action summons and complaint to Jay and Renfro in an Adco envelope with no covering letter of explanation, and so the issue is not here presented whether the *insured's breach* of the implied covenant can be a bar or offset to any alleged breach of the implied covenant by the insurer. However, on this

record, where the direct evidence is undisputed that California Shoppers itself contributed to the events leading to Scott's mistaken belief that Adco was the Royal Globe insured seeking a defense to the *Uneedus* action, it is logical to hold that the mere mistake thereby resulting constitutes the "proper cause" without the presence of which, according to *Gruenberg,* there would otherwise have been a breach of the implied covenant, and with the presence of which there would be no such breach.

Turning to precedent applicable to the evidence offered by California Shoppers in support of its alternative theory of tort liability, i.e., the alleged failure to investigate, it is necessary to address the threshold question of whether Scott breached a law-imposed duty to investigate on *any* viable theory. There was no dispute in the direct evidence of what Scott did or did not do. We have established that the jury could not permissibly infer that Scott had *actual notice* that it was California Shoppers who had tendered the defense of the *Uneedus* action. At this point, we deem it significant, noting again, that the trial court, in reciting its findings at the time it ruled on California Shoppers' motion for judgment notwithstanding the verdict, stated, "there is no showing that the defendant . . . acted with a conscious disregard of plaintiff's rights." Thus the key question to be answered at this point in the analysis is whether Royal Globe, acting through Scott, had a legal duty in terms of the implied covenant to do any more than it did.

Defining the tort duty of course involves resort to legal precedent, and California Shoppers has marshalled all the authorities which hold that a failure to investigate is evidence of bad faith which, arguably, suggests there is a duty to investigate if the tort is to be avoided.

Part of California Shoppers' instruction No. 16 recited that "Denial of a claim by an insurance company without thoroughly investigating the foundation of its denial constitutes a breach of the obligation of good faith and fair dealing." The authorities cited for this proposition include *Egan* v. *Mutual of Omaha Ins. Co.* (1979) (24 Cal.3d 809 [169 Cal.Rptr. 691, 620 P.2d 141], *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910 [148 Cal.Rptr. 389, 582 P.2d 980], *Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452 [113 Cal.Rptr. 711, 521 P.2d 1103], and § 790.03 of the Insurance Code.)

On the facts of those cases, where the insurer failed to investigate the nature of the claim of a *known* insured, there is no question but that these authorities stand for the proposition above quoted. Here, however, California Shoppers is urging that what Royal Globe omitted to do was tortious

because it did not pursue investigation into a possible *identity* of another insured besides Adco.

What California Shoppers has neglected to deal with in its general exposition on the duty to investigate is the threshold question of notice, *actual notice.* While constructive notice has significance in determining contractual liabilities, it has no application here. More particularly, without actual presentation of a claim by the insured in compliance with claims procedures contained in the policy, there is no duty imposed on the insurer to investigate the claim. (*Paulfrey* v. *Blue Chip Stamps* (1983) 150 Cal.App.3d 187 [197 Cal.Rptr. 501].)

In *Paulfrey,* the plaintiff sued her employer and its group health and accident insurance carrier, alleging a bad faith refusal to pay policy benefits. The trial court directed a verdict for the plaintiff which was reversed on appeal. The plaintiff had failed to comply with the claims procedure contained in the policy in that notice of her claim had not been given as required. The appellate court said that this represented evidence which the jury should have had a chance to consider in deciding whether there had been a breach of the implied covenant of good faith and fair dealing; hence the reversal.

In the course of its opinion the *Paulfrey* court noted the full range of cases from *Austero* v. *National Cas. Co.* (1978) 84 Cal.App.3d 1 [148 Cal.Rptr. 653], to *Silberg* v. *California Life Ins. Co., supra,* 11 Cal.3d 452. In *Austero,* the court held that the insurer's handling of the claim, in terms of the investigation conducted, *was not tortious* as a matter of law. In *Silberg,* the court held that the insurer's handling of the claim *was tortious* as a matter of law.

After recognizing these possibilities on opposite ends of the evidence spectrum and implicitly conceding the middle ground where the choice is up to the jury, the *Paulfrey* court went on to say, "What constitutes a claim and the filing thereof pursuant to provisions of a contract are mixed questions of fact and law. To keep her part of the bargain, Paulfrey here was obligated under these provisions to furnish written notice of the claim to Blue Chip or Aetna together with written proof covering the occurrence and extent of the loss. The standard of reasonableness, along with other rules governing insurer conduct set down by case law, dictate that unless and until Paulfrey satisfied both requirements, or substantially complied therewith, Aetna and its' [*sic*] agent, Blue Chip, were under no obligation to investigate Paulfrey's claim." (*Id.,* at p. 200.) Earlier the *Paulfrey* court had characterized the "standard" above noted when it stated, "Insurance

contracts legitimately call for the filing of a claim, complete with proof of loss. It would seem reasonable that any responsibility to investigate on an insurer's part would not arise unless and until the threshold issue as to whether a claim was filed, or a good faith effort to comply with claims procedure was made, has been determined. In no event could an insured fail to keep his/her part of the bargain in the first instance, and thereafter seek recovery for breach of a duty to pay seeking punitive damages based on an insurer's failure to investigate a nonclaim." (*Id.*, at pp. 199-200.)

Applying *Paulfrey,* and evaluating the undisputed evidence here, we come down on the *Austero* end of the spectrum and hold as a matter of law that there was no actual notice given Royal Globe by California Shoppers of its request for a defense. As a consequence, no duty to investigate ever arose with the result that Royal Globe's not "investigating," in terms of seeking out the identity of an unknown insured, was not a breach of the implied covenant of good faith and fair dealing.

Interestingly, the dissent asserts that Royal Globe *did* receive actual notice of a claim, albeit that ostensibly the claimant was Adco. Regardless, the dissent urges that the issue remains as to whether the insurer had a duty to investigate if the claim had actually been presented by another of its policyholders. In response, we must emphasize that the task here is to decide whether to raise the duty to investigate in a context of whether there was a breach of the implied covenant, i.e., a tort. We emphasize further that duty is a legal concept and none of the authorities cited by California Shoppers announcing a duty to investigate deal with an undisclosed insured, especially when that insured is undisclosed through its own fault. Even so, it is suggested that the failure to investigate here can be charged to Royal Globe's poor business practices and that the mistake induced by California Shoppers could not relieve Royal Globe of its duty to inquire if in fact some party other than Adco were seeking a defense to the *Uneedus* action. *Paulfrey* provides the answer to that argument. There, even with a known insured, the court entertained the possibility of holding as a matter of law that a failure to comply with the notice requirement of the policy did relieve the insurer of a duty to investigate. (*Paulfrey* v. *Blue Chip Stamps, supra,* 150 Cal.App.3d 187, 200.) So it is here.

4. *Liability Aside, No Damages Were Proved*

We come now to the fourth part of our analysis under part C (the $3 million in damages for economic loss) of part III (other damages). It involves a review of California Shoppers' evidence offered to justify the $3

million award for economic loss. Regardless of the liability issue, Royal Globe argues that no economic damages were proved on *any theory,* especially a tort theory. We agree.

Section 3300 of the Civil Code, is the starting point for any such inquiry. It provides, "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, *or which, in the ordinary course of things, would be likely to result therefrom.*" (Italics added.) The corresponding Civil Code provision for tort cases is section 3333, likewise already cited. That section provides, "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, *whether it could have been anticipated or not.*" (Italics added.)

 As observed in *Twentieth Century-Fox Film Corp.* v. *Harbor Ins. Co.* (1978) 85 Cal.App.3d 105 [149 Cal.Rptr. 313], ". . . but the measure of damages in tort is broader than that in contract (Cf. Civ. Code, § 3300 and § 3333.)" *(Id.,* at p. 113, fn. 8.) The foregoing distinction between the two measures of damages, as defined by these statutes was noted also in *Weaver* v. *Bank of America* (1963) 59 Cal.2d 428 [30 Cal.Rptr. 4, 380 P.2d 644], where the court said, "While the causal extent of damages may be more limited [in contract] than in tort (see *Hunt Bros. Co.* v. *San Lorenzo Water Co.* . . . 150 Cal. 51, 56-57 . . .; *Abramowitz* v. *Bank of America, supra,* [131 Cal.App.2d Supp. 892] at p. 896, compare Civ. Code, § 3300 with Civ. Code, § 3333), nevertheless, damages actually contemplated, or within the reasonable contemplation of the parties, are recoverable." *(Id.,* at p. 434.)

From these pronouncements in the authorities, interpreting the two sections of the Civil Code above quoted, the rule clearly applicable is that measuring the scope of recoverable damages in breach of contract cases must be restricted to such damages as were actually contemplated by or within the reasonable contemplation of the parties at the time they entered into the contract. Moreover this measure, i.e., "within the reasonable contemplation of the parties," *(Weaver, supra,* at p. 434) is something much more limited in scope than that applied in tort cases where the fiction of foreseeability of the risk is one of many factors woven into the complicated fabric which finally is labeled proximate cause in such cases.

 Here the contract was one of insurance; the breach was a failure to defend an action brought within a risk contemplated by the policy. The

contract of insurance was only a peripheral item in terms of the business conducted by the California Shoppers. In other words, California Shoppers was not primarily in business to defend itself against litigation, it was primarily in business to publish an "advertiser" type newspaper which depended for income on the sale of advertising. Its day-to-day successful functioning had very little, if any, relationship to whether it was insured against the possibility of having to hire its own lawyer if sued within the area of risk otherwise covered by the policy.

To bring the award of $3 million of *consequential* damages resulting from the breach of the duty to defend within the measure of damages rule we have recited, it would be necessary to hold that the parties contemplated, *at the time the insurance was purchased,* that: (1) California Shoppers would violate the Unfair Practices Act; (2) a competitor would sue California Shoppers because of such violations; (3) Royal Globe would decline coverage and the tender of this defense; (4) because of $39,000 in attorney's fees incurred to defend the action, California Shoppers would be forced to sell the publishing enterprise for $1.5 million[9]; and (5) *Royal Globe was aware of the California Shoppers' long-range plan to sell the business at a later date after it had greatly appreciated in value.*

The mere recital of the requisite combination of items the parties would have had to have in mind to justify this award of damages demonstrates that they could not have been awarded as consequential damages for breach of the contractual duty to defend. In short, measured by the terms of section 3300 of the Civil Code, there was no evidence that a breach of the contractual duty to defend contemplated California Shoppers' loss of $3 million under California Shoppers' theory of how it suffered an economic loss.

Otherwise, even if we were to accept that Royal Globe tortiously failed to defend, which we do not, Royal Globe, for its part, without resort to particular characterizations of the breach as tort or contract, challenges this item of damage on at least two grounds: (1) such damages represented a double recovery; and (2) such damages are totally speculative and thus not cognizable at law.

---

[9] On the facts in the record, even this is a highly questionable assumption. Don Sandbom, a former shareholder of California Shoppers, testified that he did not think any of the other shareholders considered the Uneedus suit "a big deal," and that the prevailing sentiment was not like "Oh my God, we're in deep trouble. It was, Royal Globe won't defend us, we'll let Kindel and Anderson do it. We'll just keep going." However, because of the disposition of the issue otherwise, we need not deal with the issue of whether the $39,000 in attorney's fees actually *caused* the sale of plaintiff's assets for $1.5 million.

(a) *The Evidence Shows a Double Recovery*

Turning to the first point, Royal Globe makes a very good argument that the award of damages for so-called economic or business loss in this case represents a double recovery. As demonstrated by the content of testimony given by one of California Shoppers' principals (Coffran), the owners of California Shoppers received more than a fair price of "one times gross sales" when the company was sold. In other words, out of the mouth of California Shoppers' principal witness, *it was undisputed that the business was sold for its fair market value.* Thus, California Shoppers' recovery of damages for "economic or business loss," premised upon an alleged loss of future earnings would necessarily constitute a double recovery. This follows, for California Shoppers' theory of damage fails to recognize that: (1) the sale price received implicitly compensated it for any expected future earnings; and (2) California Shoppers had the use of the sale proceeds for investment dating from the time of the sale.

It is axiomatic that the current market value of a business as a going concern includes the discounted present value of its estimated flow of future earnings. ▉▉▉ In recognition of this principle, numerous cases analogous to the one now under review have held that a plaintiff cannot receive both the fair market value of its business plus damages for loss of future profits. (*Albrecht* v. *Herald Company* (8th Cir. 1971) 452 F.2d 124, 131; *Gustafson* v. *General Motors Acceptance Corporation* (8th Cir. 1973) 470 F.2d 1057, 1061; *Greene* v. *General Foods Corporation* (5th Cir. 1975) 517 F.2d 635, 663; *Pollock & Riley, Inc.* v. *Pearl Brewing Company* (5th Cir. 1974) 498 F.2d 1240, 1244.)

▉▉▉ The consistent rule appearing from the authorities cited compels us to reach the same result here. The owners of California Shoppers concededly received a fair price for the sale of all of its assets as a going concern. Whatever their motives may have been for selling the business, the owners of California Shoppers could not thereafter fairly expect to recover an *additional* sum for prospective economic loss by claiming that the business would have produced an increased earnings stream or that the business would have increased in value. These value components were implicitly taken into account in the sale price paid California Shoppers by Harte Hanks.

(b) *The Damages Proved Were Speculative*

Turning to Royal Globe's other point, the award here did not even follow the theory applied in the cases California Shoppers cited involving "loss of

profits." California Shoppers' theory was, had it not been "forced" to sell its assets when it did, such assets could have later been sold for $10 million. Here, there was no "loss" of profits in terms of there having been a crippling of the operation of a business. Plaintiff's theory of "loss" was that it could have sold its assets for more than the $1.5 million it sold them for, had it been able to postpone the time of sale. This is a theory of "loss" which *nowhere* has support in precedent.

■ It is the generally accepted rule, in order to recover damages projected into the future, that a plaintiff must show with reasonable certainty that detriment from the breach of contract will accrue to him in the future. (*Caminetti* v. *Pacific Mut. Life Ins. Co.* (1943) 23 Cal.2d 94, 103 [142 P.2d 741].) Damages which are remote, contingent, or merely possible cannot serve as a legal basis for recovery. (*Frustuck* v. *City of Fairfax* (1963) 212 Cal.App.2d 345, 367-368 [28 Cal.Rptr. 357].)

In the recent case of *Earp* v. *Nobmann* (1981) 122 Cal.App.3d 270 [175 Cal.Rptr. 767], the court reversed an award of consequential damages made to a landowner in connection with its loss of use of the proceeds from a delayed real estate sale. The court held the award to be speculative because no evidence had been introduced to establish how the loss of use of funds had caused out-of-pocket expenses in lost profits to the landowner. (*Id.*, at p. 295.)

■ In the case here, *California Shoppers offered no probative data of a mathematical nature, or otherwise, as to how its profits would have been generated if the business assets had not been sold when they were.* No financial documents reflecting its profit and loss history or its profit projections were presented. California Shoppers also failed to present any expert analysis with respect to its future profit potential or other pertinent factors relating to its particular industry and relevant economic trends impacting on either the company or that industry.

The evidence which *was* introduced showed that California Shoppers had consistently operated in the red. Mr. Coffran's assertion that California Shoppers' assets could have been sold for a greater price at a later time is not supported by any reliable data. The postsale profit performance of the business, alluded to during Mr. Coffran's testimony, does not corroborate his claim. California Shoppers' claimed projection of profits ignored the additional funds invested by Harte Hanks (who purchased California Shoppers' assets), the circulation and territorial expansion effected by such investment, the opening of new offices and the hiring of additional personnel. California Shoppers' theory of loss of future profits also ignored the internal

problems it was experiencing as a result of the frequent infighting occurring among its principals. California Shoppers simply assumed, and asked the jury to accept that assumption, without any evidentiary support, that it would have achieved the same results as Harte Hanks, a national chain (and in fact while in competition with that chain) without Harte Hanks' resources or expertise.

 As the Supreme Court observed in *Continental Car-Na-Var Corp.* v. *Moseley* (1944) 24 Cal.2d 104 [148 P.2d 9], "Evidence to establish [lost] profits must not be uncertain or speculative. This rule does not apply to uncertainty as to the amount of the profits which would have been derived, but to uncertainty or speculation as to whether the loss of profits was the result of the [breach] and whether any such profits would have been derived at all." (*Id.*, at p. 113.) This is precisely the uncertainty which the record discloses here. As a consequence, whether the causation relied upon was breach of contract or tort, there was no competent evidence that California Shoppers suffered any measurable damages in the form of economic loss as a proximate result of either.

As a result of the failure to adduce competent evidence of any damages for economic or business loss, the trial court's order which denied Royal Globe's postjudgment motion, i.e., on this item of the verdict, was error for this additional reason.

### 5. *Instructional Errors*

Defendant contends there were prejudicial errors in instructions. We agree.

 On the liability issue, at trial and on appeal Royal Globe's attorney objected vigorously to several provisions of instruction No. 16, which included descriptions of possible insurance company behavior constituting a breach of the obligation of good faith and fair dealing. He argues that many of the included descriptions either did not constitute bad faith under existing law, or could not be traced to any facts in the evidence, and all of this polemic-type material could well have served to mislead the jury.

On the damages issue, in its opening brief, Royal Globe states, "The damages awarded to plaintiff for . . . prospective economic loss . . . are not recoverable as a matter of law. [] It was thus error to instruct the jury to award these damages to plaintiff. In addition, the foregoing instructions improperly commanded the jury to award these damages in the event it found liability on the part of Royal, without regard to whether plaintiff had sustained its burden of proving its alleged damages."

Turning to another point, California Shoppers' instruction No. 9 in its entirety reads:

### "COMPENSATORY DAMAGES

"If under the Court's instructions you find that plaintiff is entitled to a verdict against defendant Royal Globe Insurance Company on any of the following theories:

"1. Breach of the implied covenant of good faith and fair dealing;

"2. Breach of the duty to defend; and/or,

"3. Fraud. you must then award plaintiff damages in an amount that will reasonably compensate it for each of the following elements of claimed loss provided that you find that such loss was suffered by plaintiff and legally caused by a breach of the implied covenant of good faith and fair dealing, a breach of the duty to defend or fraud. The amount of such award shall include:

"1. Expenses, if any, incurred by plaintiff in satisfying the judgment against it by Uneedus Corporation.

"2. Expenses, if any, necessarily incurred by plaintiffs in defending the action by Uneedus Corporation.

"If items one and two of loss are determined by you to have occurred, you shall then determine the date which said loss occurred. You shall then increase your award to reflect any loss attributable to the diminution in the purchasing power of the dollar that has occurred since such date. This loss is commonly referred to as 'past inflation loss.'

"3. All other economic or business losses, if any.

"If you find liability against defendant Royal Globe on the theory of breach of implied covenant of good faith and fair dealing in addition to the above damages you must award plaintiff attorneys' fees necessarily incurred by plaintiff California Shoppers and reasonably required to secure any benefits owing under the insurance policy. In this regard, California Shoppers is not entitled to attorneys' fees incurred in the recovery of damages, if any, attributable to economic loss or punitive damages."

The prejudicial defect in this instruction, as pointed out in Royal Globe's brief, is that its clear intendment is that the jury award damages without

differentiating between contract and tort damages, should the jury find liability on *any* of the three theories set forth in the instruction be found to exist. Mr. Gallagher, on behalf of Royal Globe, objected particularly in the trial court to this feature of the instruction when Mr. Austero insisted that all three theories of recovery be lumped into a single damage instruction. (Cf. *Quigley* v. *Pet, Inc.* (1984) 162 Cal.App.3d 877, 893-894 [208 Cal.Rptr. 394].)[10]

Otherwise, there was no provision in this instruction to explain the elements of proof necessary to provide the basis for finding damage, even assuming liability were established. ▇▇ The court, in *Dodge* v. *San Diego Electric Ry. Co.* (1949) 92 Cal.App.2d 759 [208 P.2d 37], said "[w]hen an instruction directs a verdict for the plaintiff if the jury finds certain facts to be true, it must embrace all things necessary to show a legal liability on the part of the defendant to warrant the conclusion that the plaintiff is entitled to a verdict. (*Rush* v. *Lagomarsino*, 196 Cal. 308 [237 P. 1066]; *Ebrite* v. *Crawford*, 215 Cal. 724 [12 P.2d 937]; *Tice* v. *Pacific Electric Railway Co.*, 36 Cal.App.2d 66 [96 P.2d 1022, 97 P.2d 844].) Repetitious references, in the instructions, that under the circumstances related the jury 'must find in favor of plaintiff' or 'in favor of defendant' has been condemned. (*Taha* v. *Finegold*, 81 Cal.App.2d 536 [184 P.2d 533].) The giving of such formula instructions has been criticized under the theory that they frequently amount to an argument rather than a fair discussion of the law. (*Elsey* v. *Domecq*, 144 Cal.App. 42 [299 P. 794]; *Douglas* v. *Southern Pacific Co.*, 203 Cal. 390, 393 [264 P. 237].)" (*Id.*, at p. 764.)

▇▇ As stated in *Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663 [117 Cal.Rptr. 1, 527 P.2d 353], "Generally speaking if it appears that error in giving an improper instruction was likely to mislead the jury and thus to become a factor in its verdict, it is prejudicial and ground for reversal [citing Witkin]." (*Id.*, at p. 670.) Moreover, " '[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction[,] prejudice appears and [the reviewing] court "*should not speculate upon the basis of the verdict.*" ' " (*Id.*, at p. 670, italics added.) ▇▇ Under this rule, the court's giving of California Shoppers' instructions No. 9 and 16, without regard to any other error, would require reversal of this item of the verdict, i.e., the $3 million for "economic and business loss." In other words, but for the modification of the judgment to delete

---

[10]In *Quigley*, the instructional error, as particularly defined in the last paragraph on page 893, including footnote 5, was a failure to include a *Seaman's* qualification in the instruction given. The legal error thus was the same here as there, i.e., that the jury, if it were to find only a breach of contract (even absent a *Seaman's* context) was *compelled* to award tort damages.

Item 5 of the verdict, *infra,* the error here would have required outright reversal of this portion of the verdict.

6. *Other Errors Requiring Reversal of $3 Million Damage Award*

 Attorney Wylie A. Aitkin was allowed to testify as a so-called expert on the subject of insurance company practices, the purpose of such testimony obviously having been designed to show that Royal Globe had not only breached the implied covenant of good faith and fair dealing, but had also gone further and behaved or failed to behave in such a way as to make it answerable in exemplary damages.

In other words, Aitkin's testimony was essentially that everything Royal Globe did with reference to California Shoppers was wrong. He was permitted to refer to California Shoppers' exhibit 19 (not placed in evidence), a chart prepared by Mr. Hafif, one of the attorneys for California Shoppers, and represented to be "statements of good insurance practices." Over objections by defense counsel, the court permitted the chart to be used before the jury to "illustrate" Aitkin's testimony. The chart itself was highly prejudicial because it set forth selected excerpts of legal propositions in a misleading manner. Aitkin's testimony contained some accurate statements of law, some incomplete statements of law, and some palpably erroneous statements of law. Whatever, almost all of this testimony was wholly incompetent.

The crux of the error here was that Aitkin in no sense was qualified as an expert to testify about the subject on which he purported to testify. There is no question both on the record and as a matter of repute at the bar, but that he is a highly qualified trial attorney, and a particularly aggressive advocate of plaintiffs' cases against insurance companies. However, no foundation whatsoever was laid to demonstrate that Aitkin had any special knowledge, skill, experience, training or education such as would qualify him as an expert on *insurance company practices.* It is no answer, that certain of his professional efforts are aimed at discovering insurance company derelictions of duty, and then taking them to task. An objection was made to his giving opinions on how California Shoppers' claim was handled.

Indeed, as Aitkin candidly admitted, he had never been employed nor even retained as counsel by an insurance company. Small wonder.

It is well settled that an expert's qualifications must be established with respect to the subject matter of his testimony. The fact that the purported

expert may be qualified in one field vaguely related to another does not mean that he is qualified in that other field. (*Putensen* v. *Clay Adams, Inc.* (1970) 12 Cal.App.3d 1062, 1081 [91 Cal.Rptr. 319].)

In *Elder* v. *Pacific Tel. & Tel. Co.* (1977) 66 Cal.App.3d 650 [136 Cal.Rptr. 203], the plaintiffs offered the testimony of an architect about the custom and practice of the construction industry. The exclusion of this testimony was excepted to, and on appeal the court held that even an expert witness would not be permitted to lapse into legal commentary. The court said, "Plaintiffs also called an architect to testify as to the custom and practices in the construction industry, and sought his opinion as to the *applicability* to defendants of certain construction safety orders relating to demolition work. The latter opinion was properly excluded. While an expert witness may properly testify as to custom and practice in construction safety (*Alber* v. *Owens* (1967) 66 Cal.2d 790, 800 [59 Cal.Rptr. 117, 427 P.2d 781]), he may not state interpretations of the law, whether it be of a statute, ordinance or safety regulation promulgated pursuant to a statute (see Evid. Code, §§ 720, 803; cf. *Hyman* v. *Gordon* (1973) 35 Cal.App.3d 769, 774-775 [111 Cal.Rptr. 262])." (*Id.,* at p. 664, original italics.) It was *precisely* the kind of thing that was excluded in *Elder* which was allowed here, and it in and of itself was so overwhelmingly prejudicial as to provide the basis for an outright reversal of Item 5 of the verdict.

Significantly, all the authorities cited by California Shoppers to support this instruction were first-party cases involving an identified insured. Here the breach of the duty to defend arose in connection with a denial of coverage because of a mistake contributed to by the party seeking policy benefits.

 The other highly prejudicial happening at the trial was to allow the exemplary damage issue to go to the jury. It is no comfort that the trial court later struck the exemplary damage award in response to Royal Globe's motion for judgment notwithstanding the verdict; an irremedial prejudice had already been inflicted. The injection of the exemplary damage issue into the trial could not help but have prejudiced the jury against Royal Globe as a consequence of the arguments of California Shoppers' counsel about Royal Globe's size and wealth, and the further argument that Royal Globe should be punished by a large *compensatory* damage award.

In an unrestrained appeal to passion and prejudice, California Shoppers' counsel urged the jury to return the largest *compensatory* damage award in Riverside County history, together with punitive damages. The only permissible purpose for awarding compensatory damages is compensation, not punishment. Yet Mr. Hafif *told the jury* that compensatory damages had to be high to justify a substantial punitive damage award. In turn, he urged

the jury to render excessive compensatory damages in order that such award "will hold up all the way to the Supreme Court." The basis for awarding compensatory damages is not to provide a meaningful factor to support an additional award of exemplary damages. Compensatory damages are awarded to compensate a plaintiff for the actual damages which he has proved he suffered. That such a truism must be stated at all is a measure of the prejudicial error which pervades the record on this point.

It is suggested, because there was no defense objection to this tactic by Mr. Hafif that we are precluded from addressing it. Such a suggestion fails to perceive the nature of the error here. We have already invoked *Merlo* v. *Standard Life & Acc. Ins. Co., supra,* 59 Cal.App.3d 5, for the proposition that there is a duty upon the reviewing court to act where it appears that a compensatory award of damages appears as a matter of law to be so excessive as to raise a presumption that it was the result of passion or prejudice. Here the record carries the matter beyond mere presumption. Mr. Hafif's invitation to the jury to bring in a large enough compensatory award so as to enable a companion punitive award to hold up all the way to the Supreme Court palpably demonstrates the injection of the kind of passion and prejudice into the jury's deliberations which *Merlo* orders us not to ignore. Moreover, there is nothing in *Merlo* which limits the commandment upon us to act as depending on whether any particular objection was made in the trial court.

In sum, the improper injection of the exemplary damage issue into the case, which afforded California Shoppers' counsel the opportunity to appeal to the passions of the jury, resulted in prejudice to Royal Globe sufficient itself to justify reversal of Item 5 of the verdict.

IV-V*

· · · · · · · · · · · · · · · · · · · · · · · ·

DISPOSITION

The trial court's order which granted Royal Globe's motion for judgment notwithstanding the verdict as to Item 6 of the verdict, the exemplary damages, is affirmed. Because such motion should have been granted as to verdict Item 3 for $50,000, verdict Item 4 for $59,493, and verdict Item 5 for $3 million, the judgment is modified to delete those items. As thus modified, the judgment is affirmed. As a consequence of the foregoing, the judgment now consists of: Item 1, $86,500; Item 2, $39,000; Item 7, $21,963. Each party shall bear its own costs on appeal.

Kaufman, Acting P. J., concurred.

*See footnote, page 1, *ante.*

**RICKLES, J.**—I respectfully dissent from that portion of the majority opinion which strikes the damages awarded for (1) economic loss and (2) attorney's fees.

The majority today bids a fond farewell to traditional principles of appellate review. With mechanical regularity, the majority intones that defendant's behavior was not unreasonable as a matter of law based on the only permissible inferences to be drawn from the direct undisputed evidence. The truth, however, is that the evidence and the reasonable inferences therefrom amply support the conclusion that defendant breached its covenant of good faith and fair dealing.

The majority compounds the problem by misconstruing the law governing an insurer's breach of its implied covenant of good faith and fair dealing.

I am compelled therefore to set both the law and the record straight.

I

THE FACTS

In examining the evidence, it must be borne in mind that an appellate court considers the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference and resolving any conflicts in support of the judgment. (*Tyrone* v. *Kelley* (1973) 9 Cal.3d 1, 7 [106 Cal.Rptr. 671, 507 P.2d 65].) The majority inverts this rule, stating the facts, resolving conflicts in the evidence, and drawing inferences therefrom all most favorably to the *appellant,* while ignoring many reasonable and crucial inferences favorable to the prevailing party. They have stood the substantial evidence rule on its head. What was traditionally a principle of judicial restraint and disinterested *judgment,* in the hands of the majority becomes a subtle weapon of appellate *advocacy.* What must be done is review the facts in some detail utilizing the correct standard.

Plaintiff tried this case on the theory that defendant received notice of, and breached its duty to defend, on at least *two separate occasions.* The first occurred in May of 1975, when plaintiff sent a copy of the *Uneedus* complaint to Jay & Renfro, *defendant's agent.*[1] Jay & Renfro had been an

---

[1] I emphasize Jay & Renfro was Royal Globe's agent because the majority appears to ignore this fact in evaluating the inferences to be drawn from the evidence. I do not believe the jury's elimination of personal responsibility caused Jay & Renfro's conduct to be removed from an evaluation of the evidence.

insurance broker for defendant for some time and was the procuring broker for the insurance policies of both Adco and plaintiff. Plaintiff sent the summons and complaint to Jay & Renfro in an Adco envelope.

Adco was not a named defendant, California Shoppers was. Jay & Renfro totally ignored this fact and forwarded the summons and complaint with a standard form referencing a policy number for Adco rather than for plaintiff.[2] (Adco and California Shoppers shared several principal stockholders.) Defendant's claims manager, Richard Scott, received the summons and complaint from Jay & Renfro. Scott claims that he checked the policy number, learned that it was issued to Adco, observed that Adco was not a named party in the complaint, and concluded that the policy did not cover the enclosed complaint. Shortly thereafter, Scott rejected the claim on the grounds that the policy provided "no coverage . . . for this suit."

Scott later claimed that he rejected the claim solely on the grounds that the policy number referenced Adco and that Adco was not named in the complaint. However, Scott had no adequate explanation as to why he informed Adco that their claim was being rejected on the grounds the policy provided "no coverage . . . for *this suit,*" rather than accurately informing them that Adco was not named in the complaint forwarded with Adco's policy number.

Roy Gibson, claims manager for Jay & Renfro, testified he had several conversations with Scott at this time. When Gibson was asked about conversations with Scott as to whether Royal Globe was going to accept or reject coverage, Gibson's answer was "I don't remember." Later on, Gibson was again questioned about whether there was any understanding that California Shoppers was insured by Royal Globe. He answered, "It was never brought up." The questioning persisted. Gibson was asked whether California Shoppers was an insured of Royal Globe's in May 1975. He answered, "With us, no. I had never heard of California Shoppers." (Adopted from the majority opinion, p. 46, *ante.*) Gibson did concede Scott had rejected the claim on the ground that the lawsuit was not covered under the policy.

Scott further admitted that he never investigated whether California Shoppers, or any of the individuals actually named in the complaint, was covered by Royal Globe. Nor did he check to see whether Adco's policy contained additional insureds who might be named in the complaint. Nor did Scott inquire of Jay & Renfro, who was *his company's* agent, the policy's pro-

---

[2]There is no evidence to suggest plaintiff supplied Adco's policy number to defendant.

curing broker and the party that had actually transmitted the complaint to Royal Globe, as to *why* they had sent him a complaint under a policy number referencing *no party named in the complaint!* Scott did not follow his own admitted routine in this case which was "to check and see if any of the individuals under the Adco policy were an additional named insured." Defendant Royal Globe's *own* expert witness, W. Mike McCray, stated that any bona fide insurance company would normally have checked to see whether *any* of the defendants named in the complaint were covered under a policy with the company. Scott admitted that "it probably would have struck me as very strange that the policy was sent to me as Adco Advertising and yet they were not a named defendant." Notwithstanding this seemingly unusual occurrence, Scott stated he undertook *no* investigation beyond comparing the policy number with the named defendants.

Confronted with these facts, the jury in this case was asked to determine whether defendant's refusal to defend was unreasonable and constituted a breach of its implied covenant of good faith and fair dealing. They determined that it was.[3] The evidence provides two separate and substantial grounds for their finding. First, the jury may have disbelieved Scott; they could reasonably have concluded that Scott actually knew or *had reason* to believe that California Shoppers was insured by defendant. Second, they could have concluded that Scott's failure adequately to investigate the source of the claim was studied negligence and was totally unreasonable, thereby constituting a breach of its covenant of good faith and fair dealing.

As to the first of these possibilities, Gibson testified he could not remember whether Scott indicated Royal Globe was going to accept or reject coverage. California Shoppers was never mentioned and California Shoppers was not insured by Royal Globe in May 1975.[4] Scott claimed he undertook no investigation to explain the discrepancy between the names on the complaint and the name on the accompanying policy number. He claimed further the *only* means available of ascertaining whether an individual or business was insured with defendant was through its policy number. Lacking California Shoppers' policy number, he could not have verified that it was insured by defendant, even if he had wanted to. This is patently untrue as

---

[3]The majority implies, because of certain alleged instructional errors, that I may not plausibly infer from the verdict that the jury determined defendant's behavior to be tortious. On the contrary, as I shall demonstrate in Section II C, *infra*, the verdict permits no other conclusion. The instructional errors alleged by the *majority* (not by defendant) are entirely irrelevant to the question.

[4]The evidence shows California Shoppers was insured by Royal Globe in May 1975. The policy was issued by defendant's agent Jay & Renfro to California Shoppers, the employer of Gibson.

Scott could have easily discovered California Shoppers was covered by requesting defendant's agent (Jay & Renfro) to check their records. Even defendant's own expert witness, W. Mike McCray, questioned whether a bona fide insurance company would lack alternative means of checking to see whether a particular entity was one of its insureds. Indeed, Scott's claim he undertook no investigation (contrary to his regular routine) to identify California Shoppers was thrown into further doubt by his admission that "it would probably have struck me as very strange that the policy was sent to me as Adco Advertising and yet they were not a named defendant."

Moreover, Scott had no adequate explanation as to why he had not truthfully and accurately informed Adco at the time that they were requesting defense of a lawsuit in which they were not a named defendant. Instead, Scott wrote them that "there would be no coverage for this suit." What "coverage" could Scott have been referring to if the complaint was entirely unrelated to Adco?

The contradictions and inherent improbabilities in Gibson's and Scott's testimony, in short, could reasonably support an inference that Scott either knew or willfully neglected to confirm the fact that plaintiff had a policy with defendant. If this was the case, then defendant unquestionably breached its covenant of good faith and fair dealing with its insured.

Notwithstanding the above, the majority argues that the jury was not entitled as a matter of law to infer wrongful conduct from Scott's "uncontradicted" protestations of innocence. This contention is palpably erroneous. The majority cites as one authority, section 3545 of the Civil Code, which states the venerable legal maxim that "[p]rivate transactions are fair and regular." From this, in spite of its disclaimer to the contrary, the majority extrapolates the rule that bad faith cannot be inferred unless there is direct evidence upon which to base such an inference. However, Civil Code, section 3545, cited by the majority in support of this novel rule, has been thoroughly eviscerated in recent years. In fact, with the enactment in 1967 of Evidence Code section 600, subdivision (a), the "former presumption of fairness and regularity . . . has been replaced by a statutory maxim *cautioning* that private transactions are (usually) fair and regular." (*Lane & Pryon, Inc.* v. *Gibbs* (1968) 266 Cal.App.2d 61, 66 [71 Cal.Rptr. 817]; italics supplied.)

There is *no* rule of law in California that bad faith must be established by direct evidence. The law does *not* mandate that a jury must accept a defendant's claim of innocence where there is no "direct" evidence to refute it. On the contrary, it is well settled that the trier of fact "has an inherent right to disregard the testimony of any witness, or the effect of any prima

facie showing based thereon, when he is satisfied that the witness is not telling the truth or his testimony is inherently improbable due to its inaccuracy, due to uncertainty, lapse of time, or interest or bias of the witness. All of these things may be properly considered in determining the weight to be given the testimony of a witness *although there be no adverse testimony adduced.* The [trier of fact] is the arbiter of the credibility of the witnesses. *A witness may be contradicted by the facts he states as completely as by direct adverse testimony,* and there may be so many omissions in his account of particular transactions or of his own conduct as to discredit his whole story. His *manner* of testifying may give rise to doubts of his sincerity and create the impression that he is giving a wrong coloring to material facts." (*Camp* v. *Ortega* (1962) 209 Cal.App.2d 275, 282-283 [25 Cal.Rptr. 873], quoting *La Jolla Casa de Manana* v. *Hopkins* (1950) 98 Cal.App.2d 339, 345-346 [219 P.2d 871]; italics supplied. See also *Quock Ting* v. *United States* (1891) 140 U.S. 417, 420-421 [35 L.Ed. 501, 502, 11 S.Ct. 733]; *Davis* v. *Judson* (1910) 159 Cal. 121, 128 [113 P. 147].)

The majority alleges that I "buy into" plaintiff's argument that Scott consciously rejected plaintiff's claim. Nothing could be further from the truth. I view the evidence in the record and attempt to judge as dispassionately as possible what a reasonable person could infer therefrom. Indeed, unlike the majority which unabashedly characterizes Scott's testimony as neither "evasive nor dissembling," I am unwilling to substitute myself for the jury and attempt to evaluate the demeanor or credibility of witnesses whom I did not personally observe. I have found selective memories most difficult to evaluate.

I do buy into the theory the jury could reasonably infer from the evidence that Scott consciously rejected plaintiff's claim. Arriving at whether such an inference can be drawn requires an appreciation of the quality of facts necessary for an inference. It is not necessary that the party show an inference in his favor is the only one that may be reasonably drawn from the evidence; he need only show that the material fact to be proved may logically and reasonably be inferred from the direct and circumstantial evidence. (See *Dimond* v. *Caterpillar Tractor Co.* (1976) 65 Cal.App.3d 173, 181-182 [134 Cal.Rptr. 895].) Bearing these principles in mind and based upon the direct and circumstantial evidence heretofore set out, the jury could reasonably infer Scott either had actual knowledge or failed to acquire actual knowledge as a result of his own conscious neglect.

There is yet a second evidentiary basis for upholding the verdict. The jury could have believed Scott's testimony he was unaware of plaintiff's existence, but reasonably have concluded that his ignorance was the result of "ostrich-like" negligence and nonexistent investigative procedures. As the majority observes: "[T]he facts confronting the claims manager Scott were

such as to put him on notice of the need to make a further inquiry. If he had made this further inquiry, he would have discovered that it was actually California Shoppers who had tendered the summons and complaint for defense, and then Royal Globe would have offered to defend. . . . In the aggregate, this represents a classic case of constructive notice which raised the contractual duty to defend. In other words, given the appropriate circumstances, the law will charge a party with notice of all those facts which he might have ascertained had he diligently pursued the requisite inquiry.''

An insurer cannot reasonably and in good faith deny benefits under its policy without thoroughly investigating the foundation for its denial. (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 819 [169 Cal.Rptr. 691, 620 P.2d 141].) This duty exists whether the subject of investigation is the validity of plaintiff's claim as in *Egan,* or the existence of plaintiff's policy, as here. It was patently obvious someone was asking Royal Globe for a defense. Based upon the evidence, I believe the jury here could reasonably have concluded that Royal Globe's investigation of, and response to, the *Uneedus* claim was unreasonable and constituted a breach of its duty of good faith and fair dealing. As the cases have continually emphasized, breach of the implied covenant of good faith and fair dealing, at least with respect to compensatory, as distinct from exemplary, damages, is ''not meant to connote the . . . presence of positive misconduct of a malicious or immoral nature. . . .'' (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 921-922, fn. 5 [148 Cal.Rptr. 389, 582 P.2d 980].) In order to recover in tort for bad faith, an insured ''must prove only that the insurance company acted negligently, i.e., that a 'prudent insurer' would have paid the claim. (See *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 818.)'' (*Brandt* v. *Superior Court* (1985) 37 Cal.3d 813, 824 [210 Cal.Rptr. 211, 693 P.2d 796] (Lucas, J., dissenting).) Defendant's failure here to take *reasonable* steps to investigate plaintiff's claim and its subsequent refusal to afford relief from the very risk insured against, amounted to a violation of its duty of good faith and fair dealing implied in every insurance policy. (*Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 819; *Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 462 [113 Cal.Rptr. 711, 521 P.2d 1103].)

There is no logical or equitable reason, and absolutely no authority, to support the majority's conclusion that an insurer's duty to investigate does not commence until it receives ''actual notice'' of a claim by an insured. Moreover, the proposition is totally irrelevant here. Defendant in this case *was* presented with ''actual notice'' of a claim. *The issue* is whether the insurer had a duty to investigate into whether that claim was presented by a valid policyholder. The facts were clearly such as to impose a reasonable duty upon defendant to *inquire* into the source of the *allegedly mysterious* summons and complaint. Had defendant done so, as even the majority con-

cedes, the mystery would have been solved. The defendant would have discovered early on that plaintiff was entitled to a defense.

The majority seeks to excuse defendant's failure to discover its insured's request for a defense as an honest and reasonable mistake in judgment. (See *Critz* v. *Farmers Ins. Group* (1964) 230 Cal.App.2d 788, 796 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142].) The issue *here,* however, is whether an insurer may escape liability in tort for a mistake induced by its *own unreasonable* failure to investigate the source of a claim. Fairness and logic clearly dictate it cannot. The cases which impose upon the insurer a reasonable duty to investigate (see, e.g., *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809) clearly apply to the facts before us. Neither law, logic nor fairness impel that we excuse an insurance company for a mistaken belief engendered by poor business practices and its own negligence.

Nothing in *Paulfrey* v. *Blue Chip Stamps* (1983) 150 Cal.App.3d 187 [197 Cal.Rptr. 501], relied upon by the majority, holds otherwise. In *Paulfrey,* plaintiff alleged that her insurer had violated its covenant of good faith and fair dealing by mishandling and negligently failing to investigate her claim for disability and accident benefits. The trial court entered a directed verdict for plaintiff, ruling as a matter of law that defendant had negligently failed to investigate plaintiff's claim. The *Paulfrey* court reversed on the grounds that triable issues of fact existed as to whether defendant had sufficient notice to trigger its duty to investigate. The court held: "[W]hether a duty arose to investigate depended on what facts the jury found to be true." (*Id.,* at p. 201.)

The same is true here. Both Adco and California Shoppers held policies issued by defendant's agent. Defendant received from *its agent* a summons and complaint under a policy number referencing Adco. Adco was not listed among the named defendants. However, California Shoppers was a named defendant. One of the principal owners of both companies was named in the complaint. Defendant's issuing agent was requesting coverage on behalf of one of defendant's insureds for this lawsuit. Whether under these circumstances a duty arose to investigate further was, as *Paulfrey* holds, a question of fact for the jury. The jury here determined that defendant had a duty to investigate and unreasonably failed to do so. The evidence sufficiently substantiates their determination. Our duty is to affirm the judgment.

There is still a third ground for a finding defendant unreasonably refused to defend.

Plaintiff claimed that defendant received a *second* notice of its claim about a year later. In July 1976, defendant admits that it received a letter from plaintiff's attorney, containing a copy of the complaint in the instant action.

The letter alerted defendant that plaintiff was one of its insureds. This letter was followed by a meeting between plaintiff's and defendant's attorneys in August 1976. At that time, defendant's counsel conceded plaintiff was one of its insureds, but he refused to acknowledge that the *Uneedus* claim was covered by the policy. Trial was set to commence in several days. In order to avoid a continuance, plaintiff's counsel requested defendant assume the defense against *Uneedus* but agree to retain the attorneys which plaintiff had already hired as a result of defendant's refusal to defend. Plaintiff also requested defendant (1) reimburse plaintiff for the attorney's fees already incurred in the defense of the *Uneedus* action, (2) agree to indemnify plaintiff in the event of a loss, and (3) pay plaintiff $100,000 damages for settlement of its claim for emotional distress. Plaintiff's attorney also requested defendant undertake the defense of California Shoppers in a separate lawsuit which had been filed against it by Adco.

Several days after the meeting, plaintiff's counsel sent a letter to defendant's counsel reiterating his demands. This letter in pertinent part stated as follows: "As I indicated to you at our meeting, I think that Royal Globe, in order to avoid making a bad situation worse, should definitely immediately assume the defense of California Shoppers on the lawsuit recently brought by ADCO, and also coverage. My understanding of this lawsuit is that it falls squarely within the coverages of the policy bought by California Shoppers.

"I reiterate that our demand for settlement at this time on the lawsuit brought by California Shoppers against Royal Globe Insurance Company is as follows:

"1. Pay attorneys' fees thus far expended by California Shoppers in the full amount;

"2. Pay attorneys' fees for the remainder of the defense of the lawsuit;

"3. Pay for any judgment returned against California Shoppers; and

"4. Offer $100,000 for settlement of the claims for emotional distress and general damages alleged in the complaint on behalf of the four or five plaintiffs against Royal Globe.

"*I'm sure you realize that the above things are separable* and that failure to remedy the situation is going to put Royal Globe in a situation from which it will be even more difficult to extricate itself than the one it is now in." (Italics supplied.)

The letter went on to repeat counsel's request plaintiff be permitted to retain the law firm which it had been forced to employ for the last year in defending the *Uneedus* action, stating: "At this late stage, it would be difficult for other attorneys to acquire the thorough knowledge of the case that Kindel & Anderson have, and it would be equally difficult to ask the judge for a continuance on the day set for trial, since the judge would undoubtedly become upset."

Defendant never responded to plaintiff's letter. Defendant continued to refuse to undertake plaintiff's defense in the *Uneedus* action even though by this time it was a clear and undisputed fact defendant had a duty to defend.

Thus plaintiff's request that defendant reimburse it for attorney's fees already expended was reasonable. So, too, was plaintiff's request that it not be forced to substitute attorneys. Trial was set to commence within several days and a substitution of attorneys would have presented major problems. Moreover, defendant continued to deny coverage under the policy. It is settled that a "conflict arises" between insurer and insured "once the insurer takes the view a coverage issue is present." (*San Diego Navy Federal Credit Union* v. *Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358, 370 [208 Cal.Rptr. 494].) Where such a conflict exists, it is reasonable for an insurer to pay for independent counsel retained by its insured, and unreasonable for the insurer to compel the insured to surrender control of the litigation. (*Id.,* at p. 375.)

While plaintiff's additional requests for a $100,000 settlement of the instant action and assumption of the defense of the *Adco* action may or may not have been reasonable, the letter and Harding's testimony clearly establish that these demands were "separable." A reasonable inference therefore is that *all* of the requests were negotiable. The letter refers to them as an "offer." They were not presented as a package on a take-it-or-leave-it basis, nor as an ultimatum, nor as preconditions to defendant's assumption of the defense of the *Uneedus* action. Defendant was not entitled to simply break off negotiations with plaintiff and continue its "head in the sand" behavior by ignoring its clear obligation to defend. Such behavior unquestionably supports the jury's conclusion that defendant violated its covenant of good faith and fair dealing.

Nevertheless, the majority insists the evidence conclusively establishes that defendant's actions cannot, as a matter of law, be characterized as unreasonable. First, the majority argues plaintiff never really requested defendant "assume" defense of the *Uneedus* action. This contention is fatuous. As earlier explained, it would not have been reasonable or practical to substitute attorneys at the time, nor was defendant legally entitled to demand

that plaintiff do so. Plaintiff reasonably requested defendant assume *financial* responsibility for defense of the *Uneedus* action. Under the circumstances, this was clearly a request that defendant "take over" the litigation.

The majority also implies defendant's refusal to defend was justified by the fact plaintiff's tender of defense of the *Uneedus* action was *un*reasonably conditioned upon defendant acceding to its other demands. This is demonstrably false. The letter is clearly susceptible of an interpretation that *all* of the requests contained therein were separately negotiable. Harding, plaintiff's counsel, testified this was plaintiff's position at the meeting with defendant's attorney, as well as the meaning intended in the letter. In view of this *extrinsic* evidence, we are not at liberty, as the majority mistakenly argues, to interpret independently the meaning of the letter. I fail to perceive the significance of the fact Harding did not author the letter. His testimony constitutes extrinsic evidence nevertheless.

In sum, the evidence adduced at trial established *three* separate bases for a finding that defendant unreasonably refused to defend plaintiff in the underlying action: (1) The direct and circumstantial evidence suggesting that Scott actually knew plaintiff was an insured and refused to defend in the face of its clear duty under the policy; (2) the evidence clearly demonstrating Scott's constructive knowledge of the validity of plaintiff's claim on the basis of defendant's negligent failure to undertake even a rudimentary investigation of the claim; and (3) the evidence establishing defendant's complete failure to respond to plaintiff's request that defendant assume the financial burden of the *Uneedus* litigation when there was no doubt about its duty under the policy. I would conclude, as the jury did, the defendant tortiously breached its duty to provide plaintiff with a defense.

## II

### A. *Refusal to Defend—Bad Faith*

This case began as a dispute over the appropriate scope of the tort of bad faith, the majority arguing this was not an evidence case and a "mere" refusal to defend could never be tortious.

The majority now grudgingly concedes that there may exist a creature known as a bad faith refusal to defend. The majority then promptly consigns this creature to the River Styx for transportation.

I begin my analysis by noting that the majority's Star Chamber treatment of the evidence avoids a clear-cut treatment of when, if at all, a tortious bad faith refusal to defend exists.

The majority would avoid a confrontation of the real issue in this case by adding the ingredients "without proper cause," "mere mistake," and "actual notice." A brief discussion of each of these barriers is necessary in order not to be derailed from our original objective.

An insurer's failure to provide a benefit "without proper cause" requires nothing more than the insurer act unfairly toward its insured in administering the benefits bargained for under the policy.

The concept of "mistake" springs from California Shoppers' forwarding to defendant the complaint in an Adco envelope. This conduct, according to the majority, induced defendant to mistakenly withhold benefits under the policy. California Shoppers, by breaching its part of the reciprocal duty of good faith and fair dealing, relieved Royal Globe of liability.

In support, the majority cites *Commercial Union Assurance Companies* v. *Safeway Stores, Inc.* (1980) 26 Cal.3d 912 [164 Cal.Rptr. 709, 610 P.2d 1038]. However, *Commercial* is not authority for the proposition advanced. *Commercial* held:

"We have no quarrel with the proposition that a duty of good faith and fair dealing in an insurance policy is a two-way street, running from the insured to his insurer as well as vice versa [citations]. However, what that duty embraces is dependent upon the nature of the bargain struck between the insurer and the insured and the legitimate expectations of the parties which arise from the contract.

"The essence of the implied covenant of good faith in insurance policies is that ' "neither party will do anything which injures the right of the other to receive the benefits of the agreement" ' [citations]. One of the most important benefits of a maximum limit insurance policy is the assurance that the company will provide the insured with defense and indemnification for the purpose of protecting him from liability. Accordingly, the insured has the legitimate right to expect that the method of settlement within policy limits will be employed in order to give him such protection." (*Id.,* at p. 918.) Under our facts, mistake is inapplicable.

I disagree with the majority's assertion the trigger to an insurer's duty to investigate is actual notice.

In spite of the muddied waters, I believe and intend to demonstrate, tortious bad faith refusal to defend existed in this case.

Before proceeding to my analysis as to why I believe a cause of action for bad faith refusal to defend exists, I would point out a misconception of

the majority as to when the duty to act in good faith arises. The implied covenant of good faith and fair dealing would impose a duty on the insured to afford a defense to its insured within the contractual boundaries of the policy. The record does not indicate plaintiff's cause of action rested on traditional theories of tort liability. Plaintiff has consistently asserted its claim is based on a theory of a bad faith refusal to afford benefits contracted for under the policy. A breach of the insurer's obligation to provide a defense is a duty included within the covenant of good faith and fair dealing sounding in both contract and tort.

"[T]he scope of the duty imposed upon the insurer by the covenant of good faith and fair dealing does not turn on whether we characterize its breach as contractual or tortious, since, in either case, the duty itself springs from the contractual relationship between the parties. Thus, defendant cannot avoid liability in this case by labelling plaintiff's cause of action as a cause in tort." (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 18 [123 Cal.Rptr. 288, 538 P.2d 744]; fn. omitted.) Thus, the majority's assertion defendant fulfilled its tort duty to act reasonably and in good faith when it rejected plaintiff's request for a defense based on honest doubts as to coverage displays a misconception of the decisions in this area and the facts of this case.

An analysis of the bad faith cases as they relate to the facts of this case leaves no doubt the failure to defend constitutes a breach of the covenant of good faith and fair dealing entitling plaintiff to tort damages.

I begin with *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032], where the plaintiff sued its insurer in tort for unreasonably refusing to indemnify him for fire losses incurred at his place of business. Plaintiff claimed that as a direct and proximate result of defendant's bad faith refusal to indemnify he had suffered "severe economic damage," "severe emotional upset and distress," "loss of earnings," and various special damages. Plaintiff sought both compensatory and punitive damages. (*Id.*, at p. 572.) The trial court granted defendant's demurrer and plaintiff appealed. The California Supreme Court reversed, holding that plaintiff could sue in tort for defendant's unreasonable refusal to indemnify.

The *Gruenberg* court perceived no basis for distinguishing an unreasonable refusal to settle from an unreasonable refusal to indemnify. "These are merely two different aspects of the same duty," the court wrote. "It is the obligation, deemed to be imposed by the law, under which the insurer must act fairly and in good faith in discharging its contractual responsibilities. Where in so doing, it fails to deal *fairly and in good faith* with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in

tort for breach of an implied covenant of good faith and fair dealing." (*Id.*, at pp. 573-574.)

It is also worth noting that the *Gruenberg* court nowhere limited the nature or extent of the damages for which an insured suing in tort may recover. On the contrary, the *Gruenberg* court reiterated the rule that an insured suing in tort may recover, pursuant to Civil Code section 3333, "all detriment caused whether it could have been anticipated or not." (*Id.*, at p. 579.) In *Gruenberg*, where the plaintiff insured sued for failure to indemnify fire losses to his business, the "detriment" included economic damage, emotional distress and loss of earnings.

One year after *Gruenberg*, the California Supreme Court decided *Silberg* v. *California Life Ins. Co.*, *supra*, 11 Cal.3d 452. In *Silberg*, the plaintiff/insured suffered injuries at his place of business. The defendant insurer refused to pay plaintiff's medical bills and as a result plaintiff incurred heavy medical expenses, his credit rating suffered and he eventually lost his business. Plaintiff sued for bad faith and fraud and a jury awarded him $75,000 compensatory and $500,000 punitive damages. The trial court granted defendant's motion for a new trial on the grounds of insufficient evidence to support the claim of bad faith and plaintiff appealed. The California Supreme Court reversed, holding that defendant's unjustified refusal to pay the medical bills constituted a breach of the implied covenant of good faith and fair dealing which rendered it liable for the damages "proximately caused by its conduct." (*Id.*, at p. 460.) The court also affirmed that portion of the judgment reversing the exemplary damage award, holding that there was no evidence defendant was guilty of oppression, fraud or malice. (*Id.*, at pp. 462-463.)

In *Egan* v. *Mutual of Omaha Ins. Co.*, *supra*, 24 Cal.3d 809, plaintiff sued his insurer in tort for refusing to pay disability benefits. The trial court granted a directed verdict against defendant, ruling as a matter of law that defendant's failure to have plaintiff examined by a doctor of its choice or to consult with plaintiff's physicians violated the covenant of good faith and fair dealing. (*Id.*, at p. 817.) A jury awarded plaintiff $45,600 in general damages, $78,000 in emotional distress, and $5 million in punitive damages. The California Supreme Court affirmed, holding that "an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." (*Id.*, at p. 819.) While holding that the evidence supported the award of some punitive damages, the court ruled that $5 million was excessive. (*Id.*, at pp. 822-824.)

A final decision worthy of mention is *Jarchow* v. *Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917 [122 Cal.Rptr. 470], a perceptive decision rendered by this court nearly a decade ago. In *Jarchow*, plaintiffs sued their

title insurer in tort for failing to discharge its duty to clear title to certain property. The jury awarded plaintiffs a total of $200,000 compensatory damages. This court affirmed the judgment, indicating that the duty to clear title was no different in kind from the duty to defend or settle. All three, we observed, involve major risks against which the insured has a reasonable expectation of protection. (*Id.*, at p. 941.) We reasoned that if the implied covenant of good faith and fair dealing did *not* extend to the duty to litigate, either in defense or to clear title, then "instead of having purchased insurance against the trauma and financial hardship of litigation, the insured will have found that he has purchased nothing more than a lawsuit," (*id.*, at pp. 942-943), and the duty to litigate will have degenerated "into nothing more than a promise to reimburse an insured for attorney's fees incurred." (*Id.*, at p. 944.)

The lesson of the foregoing cases is clear. The gravamen of the tort for breach of the implied covenant of good faith and fair dealing, at least in the insurance context, lies in the special relationship which exists between insurer and insured. As stated by the court in *Egan:* "The insured . . . does not seek to obtain a commercial advantage by purchasing the policy—rather, he seeks protection against calamity . . . The purchase of such insurance provides peace of mind and security . . . ." (*Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 819.) As stated by this court in *Jarchow:* "Since a primary consideration in purchasing insurance is the peace of mind and security it will provide when the contingency insured against arises [citation], an insured may recover for any emotional distress suffered as a result of an insurer's bad faith, as well as any other detriment proximately resulting from the breach. (*Silberg* v. *California Life Ins. Co.*, 11 Cal.3d 452, 460-461 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d 566, 580; *Comunale* v. *Traders & General Ins. Co., supra,* 50 Cal.2d 654, 660.)" (*Jarchow* v. *Transamerica Title Ins. Co., supra,* 48 Cal.App.3d at p. 940.)

The reasoning underlying *Gruenberg, Silberg, Egan,* and *Jarchow* leaves no room for distinguishing the duty to defend from the duty to indemnify. In each case the insured has contracted for protection from calamity, for "the peace of mind and security it will provide when the contingency insured against arises . . . ." (*Jarchow, supra,* 48 Cal.App.3d at p. 940.) Indeed, in many cases, as the *Jarchow* court perceived, the "trauma and financial hardship of litigation" might *exceed* that occasioned by a failure to indemnify. (*Id.*, at p. 942.)

Where the insurance contract requires the insurer to provide a defense, the unreasonable withholding of that defense may be a breach of contract. Indeed, the majority concedes that defendant here violated its contractual duty to defend. What the majority fails to understand is that the evidence

here, construed in accordance with traditional standards of appellate review, amply supported the jury's conclusion that defendant's refusal to defend was unreasonable.

To repeat, I conclude that the reasoning which permits recovery in tort for an insurer's unreasonable refusal to indemnify leaves no principled basis for denying the same tort recovery where an insurer unreasonably refuses to defend. That right exists independent of the insurer's actions on the indemnity issue, for the duty to defend is much broader than, and certainly as vital to the interest of the insured, as the duty to indemnify. In *Jarchow*, this very court recognized that an insurer's unreasonable refusal to *litigate* a claim on behalf of its insured constituted a breach of the implied covenant of good faith and fair dealing. The majority offers no creditable basis for distinguishing *Jarchow* from the case at bar.

While the California authorities which I have marshalled leave no doubt in my mind as to the soundness of plaintiff's action, two sister-state courts which have considered the same issue offer further illumination.

In *Smith* v. *American Family Mut. Ins. Co.* (N.D. 1980) 294 N.W.2d 751 [20 A.L.R.4th 1], the Supreme Court of North Dakota confronted the very issue before us. Plaintiff brought an action against his automobile liability insurer for wrongfully refusing to defend him against a lawsuit arising from an automobile collision. In his action, plaintiff alleged breach of contract, tortious breach of the implied covenant of good faith and fair dealing, fraud, and intentional infliction of emotional distress. The jury awarded plaintiff $4,000 damages for breach of contract, $3,000 for breach of the implied covenant of good faith and fair dealing, and $50,000 punitive damages. On appeal, defendant claimed that a failure to defend is a breach of contract, but does not constitute a tort on the part of the insurer. The Supreme Court rejected the defendant's contention, holding that under the implied covenant of good faith and fair dealing an insurer may not unreasonably refuse to defend its insured against a lawsuit covered by the policy. Significantly, in reaching this conclusion the *Smith* court relied upon the California Supreme Court's decision in *Gruenberg*. The *Smith* court perceived no policy or legal basis for distinguishing an unreasonable refusal to indemnify from an unreasonable refusal to defend. "We cannot differentiate between a failure to pay, as in *Gruenberg*, and, here, a failure to defend, if the insurer breaches its covenant to act fairly and in good faith in discharging its contractual responsibilities." (294 N.W.2d at p. 758.)

The *Smith* court took note of *Farris* v. *U.S. Fidelity & Guaranty Co.* (1978) 284 Ore. 453 [587 P.2d 1015]. In *Farris*, the Oregon Supreme Court also considered the issue of whether or not the failure of an insurer to defend the insured under a liability policy could give rise to a tort action. The

majority of the Oregon court concluded that the insured had only a cause of action for breach of contract. Like the court in *Smith,* however, the *Farris* court recognized that the holding in *Gruenberg* logically compelled a recognition of the tort claim for failure to defend. (587 P.2d at p. 1021.) However, the majority of the *Farris* court rejected *Gruenberg*'s reasoning. The *Farris* majority distinguished a failure to settle from a failure to indemnify or defend on the ground that the former involved the insurer in a "fiduciary" relationship with the insured which imposed a duty of good faith and fair dealing, while the latter invoked no special relationship and hence involved no more than a mere breach of contract. (587 P.2d at pp. 1019-1021.)

The minority opinion in *Farris,* however, would have recognized plaintiff's tort claim for failure to defend. It rejected as spurious the majority's distinction between the duty to settle and the duty to defend. It scorned the majority's reasoning "that a bad faith breach by the insurer after undertaking performance of the contract is somehow different from a bad faith breach in refusing to perform at all." (*Id.,* at p. 1027.) The "special relationship" between insurer and insured, the minority argued, arises from the insurer's right and responsibility to assume, finance and control the litigation of claims against the insured. That special relationship does not first commence with the *exercise* of the right; rather it is immanent in the contract itself and grounded in the *reasonable expectation* of the insured of a legal defense. "In fact, the basis of liability insurance is not just the assumption of actual cost and losses that result from a lawsuit but also the assumption of the *risk* of being sued, of the selection of an attorney, of the responsibility and control of the litigation, and even of the risk of losing." (*Id.,* at p. 1028, italics supplied.)

Furthermore, by limiting plaintiff to contract damages, the minority in *Farris* noted the distinction advanced by the majority would actually *encourage* an insurer to breach its contract before undertaking a defense "rather than risk the tort liability applicable to bad faith breaches *in performance.*" (*Id.,* at p. 1028, original italics.)

Still another disturbing consequence of limiting plaintiff to contract damages for breach of the duty to defend is the inequitable treatment such a rule would afford the rich and poor in society. Under the majority rule, those insureds fortunate enough to absorb the heavy costs of litigation without any collateral damage may indeed be fully compensated through the award of attorney's fees. However, those less fortunate insureds who must sacrifice in order to finance their defense would certainly not be fully compensated for their losses. Only a rule that recognizes the potentially tortious nature of a bad faith refusal to defend can assure that all insureds, rich and poor alike, will have the opportunity to recover all of their losses.

To reiterate, where an insurer defeats its insured's reasonable expectations of a legal defense in an unreasonable manner, the damages which result therefrom are not solely or even primarily those occasioned by the costs and fees of the lawsuit. The damages may be emotional distress; they may be economic losses as the result of heavy litigation expenses. The reasoning in *Gruenberg* clearly dictates that these damages are recoverable in tort.[5] As the minority in *Farris* observed, "part of the uniqueness of the relationship between the liability insurer and the insured is that the insurer accepts the *risk* of being sued and dealing with a lawsuit" of selecting an attorney, controlling the litigation, meeting the escalating litigation costs, and ultimately bearing the risk of losing. (587 P.2d at p. 1028, italics supplied.)

Refusing to recognize plaintiff's tort action on the ground that contract damages are adequate and there is no such creature misses the point. The insured has contracted precisely to avoid the substantial economic and emotional burden of assuming and controlling the litigation at the outset. It ignores the fact that the economic costs of defending a lawsuit could throw a business operating on a narrow profit margin into bankruptcy. It ignores the internal dissension and causal finger-pointing such litigation caused a small business. It ignores the fears of financial drain generated by the mere *prospect* of extended litigation. It ignores the substantial emotional distress occasioned by the personal responsibility for providing one's own legal defense. It ignores those less fortunate insureds who may not be able to afford their own attorney over the course of an extended lawsuit. Finally and most importantly, it ignores the insurer's obligation to live up to the implied covenant of good faith and fair dealing with its insured.

In sum, I believe that California law, logic, and fundamental fairness all militate in favor of a recognition of the tort of bad faith refusal to defend.

---

[5]The commentators have generally recognized that jurisdictions which permit first-party bad faith actions must, by analogy, sanction tort recovery for bad faith refusals to defend. For example, in Shernoff, Gage and Levene, Insurance Bad Faith Litigation, section 3.25[1], the authors write: "[A] growing number of jurisdictions hold that an insurer that withholds benefits due under a policy in bad faith may be subject to tort liability. By analogy to these cases, there appears to be no valid reason why a liability insurer that refuses in bad faith to defend its insured against a third-party action should not also be subject to tort liability for breach of the implied covenant of good faith and fair dealing."

"[A]t least one court [*Smith* v. *American Family Mut. Ins. Co., supra*] has expressly held that an insurer's unjustified refusal to defend may lead to tort liability for breach of the duty of good faith and fair dealing, and it seems likely that those jurisdictions that have imposed tort liability for unreasonable refusal to pay claims would reach a similar result." (*Id.*, at section 3.26[2].)

Ashley, Bad Faith Actions (1984) section 4.09, reaches the same conclusion: "[O]ne should not be surprised to find a jurisdiction that has recognized the first-party cause of action [for bad faith refusal to indemnify] . . . treat a breach of the promise to defend as a form of bad faith."

Applying the foregoing rule of law to the facts as previously set forth, it requires little effort to demonstrate that substantial evidence supported the jury's verdict. If the jury believed that defendant received actual notice in May 1975, yet flatly refused to defend despite its clear duty under its policy, and still later pretended to have never received notice, then certainly the jury was entitled to conclude that defendant's behavior toward its insured violated its covenant of good faith and fair dealing. Alternatively, defendant's failure to take any reasonable steps to investigate the circumstances of plaintiff's claim in 1975 clearly justifies a conclusion that its behavior was negligent (if not reckless) and unreasonable. Still, a third opportunity to find defendant in violation of its covenant of good faith and fair dealing presents itself in the events occurring in the fall of 1976. Defendant was then aware of plaintiff's claim, yet it refused to consider plaintiff's reasonable demands that defendant (1) compensate plaintiff for attorney's fees expended, (2) permit plaintiff to retain the counsel it had employed for over a year, and (3) compensate plaintiff for future legal expenses. Plaintiff's two additional requests, for coverage of the *Uneedus* claim and compensation for emotional distress, were clearly "separable." At minimum, response from defendant was required. Hence the evidence amply supports a finding that defendant's refusal to respond to plaintiff's offer and continued refusal to defend constituted a breach of its implied covenant of good faith and fair dealing.

The standard measure of tort damages in California "is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ. Code, § 3333; *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, at p. 433 [58 Cal.Rptr. 13, 426 P.2d 173].) The insurer's breach of the duty of good faith and fair dealing "constitutes a tortious interference with a property interest of its insured for which damages may be recovered to compensate for all detriment proximately resulting therefrom, including economic loss as well as emotional distress . . . and, in a proper case, punitive damages." (*Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, at pp. 401-402 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].)

Plaintiff herein adduced evidence that the internal dissension and pressure caused by having to manage the lawsuit coupled with the strain on operating capital and the cost of undertaking its own defense necessitated a premature sale of the business for $1.5 million. Plaintiff also offered expert testimony that the market value of a mature business would have been $10 million. Hence the evidence substantially supports the jury's award of $3 million damages for economic loss. Therefore, I would affirm this portion of the judgment.

### B. *The $59,000 Award of Attorney's Fees to Procure Policy Benefits*

As the majority correctly observes, the split of authority in California as to whether attorney's fees to obtain policy benefits are recoverable as lost damages was recently resolved by the Supreme Court in favor of recovery. (*Brandt* v. *Superior Court, supra,* 37 Cal.3d 813.) Having determined that plaintiff herein was entitled to recover in tort for breach of the covenant of good faith and fair dealing, an appropriate element of the damages would include attorney's fees for the maintenance of the instant action as it relates to the procurement of benefits due under the policy. Therefore, the jury's award of attorney's fees for this purpose should be affirmed.

### C. *The Alleged Instructional Errors*

The majority asserts that an erroneous charge to the jury contained in plaintiff's instruction No. 9 permitted the jury to "award damages without differentiating between contract and tort damages. . . ."

The most appalling aspect of the majority's argument, other than its lack of merit, is the suggestion that defendant herein has raised this issue on appeal. The farthest appellant goes in this regard is the general statement, devoid of theory or argument, that the damages for prospective economic loss "are not recoverable as a matter of law." In fact, on appeal defendant has challenged instruction No. 9 on a ground having nothing whatsoever to do with the issue raised by the majority. The majority has graciously formulated a new and different theory on appeal from that argued by appellant itself.

Thus it is apparent that here, again, the majority has abandoned its judicial role and assumed that of appellant's advocate. The majority makes arguments for appellant Royal Globe which Royal Globe has not itself made! Moreover, it is apparent on close examination that Royal Globe is actually *precluded* from raising them.

The gist of the majority's argument is that although instructed on plaintiff's theories of recovery in contract and tort, and on the damages which it could recover in the event of a breach, they were not properly instructed on the distinction between the measure of damages for breach of contract (of the duty to defend) and for tort. The majority does not challenge the accuracy of the instruction in question, but argues that it was incomplete and hence prejudicial because they omitted this allegedly crucial distinction.

It is clear that if *defendant* were raising this contention this court would refuse to consider it. Defendant failed to request the additional instruction

alleged by the majority to have been erroneously omitted. As this court, per Justice Kaufman, stated in a similar case where the insurer was complaining about the set of bad faith instructions given: "If [insurer] was not satisfied with the instruction on this point, it was incumbent upon it to request more complete, appropriate instructions of its own. [Citations.] 'In a civil case, each of the parties must prepare complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion.' [Citation.]" (*Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 13 [130 Cal.Rptr. 416]; see also *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 59 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878] ["[I]t remains the duty of a party to propose complete and comprehensive instructions in accordance with his theory of the litigation"]; *Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 948 [160 Cal.Rptr. 141, 603 P.2d 58] ["It is settled that a party may not complain on appeal that an instruction correct in law is too general or incomplete unless he had requested an additional or qualifying instruction."].)

Furthermore, there is no likelihood that the jury was misled in the manner suggested by the majority. The majority assert that the jury may have felt "compelled" to award all foreseeable damages, including economic losses, even if all they found was a breach of contract. On the contrary, it is simply impossible *not* to infer that the jury concluded defendant had breached its covenant of good faith and fair dealing. There are two reasons for this. First, the jury in this case was instructed they may impose punitive damages if they determined that defendant was guilty of oppression, fraud or malice, i.e., if defendant acted with the intent to vex, injure or annoy or with a conscious disregard of plaintiff's rights. The jury awarded $2 million in punitive damages. It is therefore crystal clear that the jury determined defendant had intentionally and in conscious disregard of plaintiff's rights refused to defend plaintiff in the *Uneedus* action. *A fortiori,* the jury *must* have determined that defendant's behavior was "unreasonable," which obviously is a lesser standard of culpability than "intentional." The trial court's ruling the evidence did not support a finding of malice in no way alters the logical implications of the *jury's* verdict. There is no mistaking the mind of this jury; their verdict reveals that they concluded defendant had acted intentionally and in conscious disregard of plaintiff's rights, which necessarily implies that they found defendant's actions to be unreasonable.

There is a second reason for concluding with absolute certainty that the jury found a breach of the implied covenant of good faith and fair dealing. After being instructed that they could award damages for (1) the *Uneedus*

judgment, (2) the attorney's fees incurred by plaintiff in defending the *Unee-dus* action, and (3) all other economic and business losses, the court further charged: "If you find liability against defendant Royal Globe on the theory of breach of implied covenant of good faith and fair dealing in addition to the above damages you must award it attorney's fees necessarily incurred by plaintiff California Shoppers and reasonably required to secure any benefits owing under the insurance policy."

Thus, the court made clear an award of damages for attorney's fees would be permissible *only* if the jury found a breach of the implied covenant of good faith and fair dealing. The jury did award $59,000 for attorney's fees incurred in securing benefits owing under the insurance policy. Therefore, I can conclusively infer the jury found defendant had breached its implied covenant of good faith and fair dealing.

"Whether a jury has been misled by an erroneous instruction or by the overall charge must be determined by an examination of all the circumstances of the case including a review of all of the evidence as well as the instructions as a whole. [Citations.]" (*Bertero* v. *National General Corp.*, *supra*, 13 Cal.3d at p. 59.) In view of the instruction on punitive damages in connection with defendant's state of mind, and the instruction on attorney's fees in connection with breach of the implied covenant of good faith and fair dealing, it is clear the failure to instruct on contract damages was harmless.

Nothing in the case cited by the majority suggests otherwise. In *Quigley* v. *Pet, Inc.* (1984) 162 Cal.App.3d 877 [208 Cal.Rptr. 394], the court held it was error to give the standard tort instruction relating to an insurance company's duty of good faith and fair dealing with its insureds, where there was no "special relationship" between the two commercial parties which would justify permitting plaintiff to sue for more than contract damages. (*Id.*, at pp. 887-893.) Obviously, plaintiff and defendant here did enjoy the "special relationship" of insurer and insured. In sum, there is absolutely no likelihood that the failure to instruct on contract damages misled the jury or resulted in prejudice to defendant. (*Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670 [117 Cal.Rptr. 1, 527 P.2d 353].)

D. *Prejudicial Errors at the Trial*

I disagree with the majority's characterization the innocent, unsophisticated, defenseless insurance company was devoured by the scheming plaintiff's attorney.

The majority cites two instances of alleged prejudicial misconduct: (1) the court's allowing attorney Wylie Aitkin to testify as an expert as to insurance company practices and (2) Mr. Hafif's (plaintiff's attorney) argument that compensatory damages had to be high enough to justify a substantial punitive damage award.

A review of Mr. Aitkin's testimony shows its admission, even if erroneous, does not require a reversal. Common sense indicates the insurance company practices followed in this instance were reminiscent of a group of eight-year-olds playing business. In any event, the jury was properly instructed as to the evaluation of expert testimony and I am confident they followed the law. I perceive no reversible error here.

The contention Aitkin's testimony concerning principles of law was "overwhelmingly prejudicial" is absurd and unsupported by the record. Moreover, the majority in its zeal does not even note the mitigating fact that *defendant* offered the expert testimony of a prominent defense attorney, W. Mike McCray, as to principles of law, as well.

As to Mr. Hafif's remarks to the jury, the record fails to show any objection by defendant to these allegedly inflammatory and prejudicial statements. In these circumstances, the law is clear that a "claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished. . . . 'It is only in extreme cases that the court, when acting promptly and speaking clearly and directly on the subject, cannot, by instructing the jury to disregard such matters, correct the impropriety of the act of counsel and remove any effect his conduct or remarks would otherwise have.' [Citation.] . . ." (*Horn* v. *Atchison T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561].) Here, defendant neither objected to nor asked that the jury be admonished to disregard, the allegedly improper remarks. "The fact that [defendant] neither asked that the jury be admonished nor demanded a mistrial should be taken to indicate that counsel did not at the time regard the argument as prejudicial." (*Hansen* v. *Warco Steel Corp.* (1965) 237 Cal.App.2d 870, 878-879 [47 Cal.Rptr. 428].) There is no doubt any harm could have been cured by defendants' prompt objection and an admonition by the court. Because defendant elected not to demand remedial action before the case went to the jury, it would be unfair to hear a complaint after receiving the unsatisfactory verdict.

In ignoring this fundamental principle of appellate review, the majority once again demonstrate their willingness to bend the rules of appellate review in order to reach a result favorable to appellant.

The jury was properly instructed as to compensatory damages and my faith is unshaken that it followed these instructions properly. Any prejudice in allowing evidence as to the punitive damages was cured by the striking of those damages. The verdict with respect to the $3 million *compensatory* damages for economic losses remains untainted, and was amply supported by the evidence.

In sum, I would reverse the trial court's determination the plaintiff was entitled to past inflation loss and affirm the judgment in all other respects.

## CONCLUSION

The evidence in the record fully supports the jury verdict; it does *not* support the mischievous new principle of law suggested by the majority.

The California Supreme Court has not yet ruled on the question whether an insured may recover in tort for any detriment directly and proximately resulting from the insurer's breach of its duty to defend. However, the opportunity will surely present itself, and when it does cases such as *Gruenberg, Silberg, Egan* and *Jarchow* leave little doubt that the court will recognize the essential logic and fundamental fairness of permitting such recovery. Hence I suspect the life of the decision announced by the majority today will prove to be, as Thomas Hobbes put it, "solitary, poore, nasty, brutish and short." (Hobbes's Leviathan (reprint 1651 ed., Clarendon Press 1929) p. 97.)

A petition for a rehearing was denied December 26, 1985. Rickles, J., was of the opinion that the petition should be granted.